## MRS. J. F. MOORE ET AL. v. STATE OF TEXAS.

No. 2315.    Decided December 22, 1915.

**1.—Practice in Supreme Court—Certified Question.**

The answer of the Supreme Court to certified questions will ordinarily be made with reference to the facts as stated in the certificate only.    (P. 493.)

**2.—Bawdy House—Agent—Renting Property—Injunction.**

Under article 500 of the Penal Code, an agent of the owner who knowingly permits the keeping of a bawdy house upon premises rented by him as such agent is guilty of a criminal offense,—knowingly permitting the keeping of such house being simply a method of committing the offense of "keeping." Willis v. State, 34 Texas Cr., 148; Schulze v. State, 46 S. W., 918. Such agent may be enjoined from permitting such use of the premises by action brought under articles 4689, 4690, Rev. Stats., 1911.    (Mr. Justice Hawkins dissents.)    (Pp. 492-494.)

**3.—Bawdy House—Owner of Premises—Renting by Agent—Absence of Knowledge.**

The owner of premises used as a bawdy house by tenants to whom they

were rented by an agent and without knowledge by the owner of such unlawful use, may be enjoined. from permitting the premises to be so used by action brought under articles 4689, 4690, Rev. Stats., 1911, though, being ignorant of such unlawful use, the owner would not be guilty of a criminal offense under article 500, Penal Code. (Mr. Justice Hawkins dissenting.) (Pp. 494-498.)

### 4.—Same—Parties—Statute.

The enumeration in article 4689, Rev. Stats., of certain classes who may be made defendants in an action to abate by injunction the keeping of a bawdy house, is not exclusive, and does not prevent the joining as defendant of any other proper party to such proceeding, such as the person owning or controlling the use of property. (Mr. Justice Hawkins dissents, holding the action to be statutory and given only against the classes of defendants named.) (Pp. 494, 495.)

### 5.—Same—Nuisance—Liability of Owner of Property.

The owner of premises is under obligation, at common law, to keep them from becoming a public nuisance. Though sometimes held exempt from liability for damages by a private nuisance thereon of which he had no knowledge, this rule is not applied to a public nuisance, nor, it seems, in all cases to a private one. But injunction against future continuance of a nuisance is not dependent on the owner's past knowledge and liability, or defeated by his want of it. He is not relieved by past ignorance from future duty to see that his premises do not continue to be applied to an unlawful use, and is a proper party to an injunction against continuance of what the judgment finds to have been a bawdy house and public nuisance thereon. The object of articles 4689, 4690 was to enlarge, not to restrict the remedy. (Mr. Justice Hawkins dissenting.) (Pp. 495-498.)

Questions certified from the Court of Civil Appeals for the Second District, in an appeal from Tarrant County.

*Slay, Simon & Wynn,* for appellants.—The undisputed testimony does not show, on the part of appellants, an aiding, abetting or being interested in keeping of a disorderly house. Lloyd v. State, 23 S. W., 188; Walker v. State, 29 Texas Cr., 621, 16 S. W., 548; Sharp v. State, 29 Texas Cr., 211, 15 S. W., 176; Schackey v. State, 41 Texas Cr., 255, 53 S. W., 878; note to 40 Amer. St. Rep., 671; People v. Rice, 103 Mich., 350, 61 N. W., 540; State v. Miller, 68 Conn., 373, 36 Atl., 795; Nelson v. Territory, 5 Okla., 512, 49 Pac., 920; Carlton v. State, 51 S. W., 213; Tracy v. State, 42 Texas Cr., 494, 61 S. W., 127.

The statute under which said injunction was granted makes no provision for an injunction against the owner, or the agent of the owner, as such. Penal Code, arts. 359, 359a, 360, 361, 362, 362a, as amended by the Acts of 1907, p. 246.

Upon receiving information that the premises were being used as a disorderly house, appellants immediately proceeded to prevent the use of said premises for such purpose by giving such information to the county attorney against the person or persons so using said premises, and took such action as would reasonably accomplish such result. Art. 361, Penal Code, as amended by Acts of 1907.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

The certificate of the honorable Court of Civil Appeals, with the question submitted, is as follows:

"This an appeal by Mrs. J. F. Moore and W. C. Blackmon from the following order of the District Court of Tarrant County: 'It is therefore ordered, adjudged and decreed by the court that the said defendants, Mrs. J. F. Moore and W. C. Blackmon are hereby temporary (temporarily) enjoined from using the house known as 1205½ Houston Street in the city of Fort Worth for the purpose of keeping, or being interested in the keeping of a bawdy or disorderly house therein.' The trial court made no findings of fact, but the evidence is sufficient to support the conclusion that appellant, W. C. Blackmon, who was the rental agent of the appellant, Mrs. Moore, knowingly permitted the house to be used for the purpose prohibited by law. There is nothing in the evidence to indicate that he was otherwise concerned in the keeping of such house further than such knowledge upon his part that the house was being so used made him interested in the same. As to appellant Mrs. Moore the evidence fails to show any connection whatever with the keeping of the house or that she knowingly permitted the same, unless the knowledge of her agent Blackmon should in law be imputed to her and render her also liable. (For a fuller statement of the evidence and as explanatory of our question reference is made to the brief Statement of Facts.)

"We, therefore, certify to your honors whether or not under the Act of the Thirtieth Legislature (1907, p. 246) authorizing the enjoining of 'the habitual, actual, threatened, or contemplated use of any premises, place, building, or part thereof, for the purpose of keeping, being interested in, aiding or abetting the keeping of a bawdy or disorderly house,' the writ in this instance was properly issued?"

The action appears to have been brought by the county attorney under articles 4689 and 4690 of the Revised Statutes of 1911, which read:

"Art. 4689. The habitual, actual, threatened or contemplated use of any premises, place, building or part thereof, for the purpose of keeping, being interested in, aiding or abetting the keeping of a bawdy or disorderly house, shall be enjoined at the suit of either the State or any citizen thereof. Any person who may use, or who may be about to use, or who may aid or abet any other person in the use of any premises, place or building or part thereof, may be made a party defendant in such suit; provided, that the provisions of this and the succeeding article shall not apply to nor be so construed as to interfere with the control and regulation of bawds and bawdy houses by ordinances of incorporated towns and cities acting under special charters and where the same are actually confined by ordinance of such city within a designated district of such city."

"Art. 4690. The Attorney General and the several district and county attorneys shall institute and prosecute all suits that said Attorney General or such district or county attorney may deem necessary to enjoin such use; provided, that such suit may be brought and prosecuted by any one of such officers; and provided, further, that nothing in the above proviso contained shall prevent such injunction from issuing at

the suit of any citizen of this State who may sue in his own name; and such citizen shall not be required to show that he is personally injured by the acts complained of; and the procedure in all cases brought hereunder shall be the same as in other suits for injunction, as near as may be; provided, that, when the suit is brought in the name of the State by any of the officers aforesaid, the petition for injunction need not be verified."

These articles are from the Act of 1907,—Acts of 1907, page 246.

The present criminal statute in relation to the keeping of bawdy houses, article 500 of the Penal Code, as amended by the same act, reads:

"Any person who shall, directly or as agent for another, or through any agent, keep or be concerned in keeping, or aid or assist or abet in keeping a bawdy house or a disorderly house, in any house, building, edifice or tenement, or shall knowingly permit the keeping of a bawdy house or a disorderly house in any house, building, edifice or tenement owned, leased, occupied or controlled by him, directly as agent for another, or through any agent, shall be deemed guilty of keeping, or being concerned in keeping, or knowingly permitted to be kept, as the case may be, a bawdy house or a disorderly house, as the case may be, and, on conviction, shall be punished by a fine of two hundred dollars, and by confinement in the county jail for twenty days for each day he shall keep, be concerned in keeping or knowingly permit to be kept, such bawdy or disorderly house."

In answering certified question our practice is to confine ourselves to the statement of the case as contained in the certificate of the Court of Appeals, since it must be assumed that it embodies the essential facts upon which the certified question is predicated. We customarily decline to look to the statement of facts, if it accompanies the certificate; and we shall therefore determine the present question simply upon the facts recited in the certificate.

As to the defendant, Blackmon, under the statement of the Court of Civil Appeals that the evidence adduced upon the hearing was sufficient to warrant the conclusion that as the agent of the owner of the premises he knowingly permitted the house to be used for the unlawful purpose, we think there can be no question as to the injunction having been properly issued. The Penal Code, article 500, attaches criminal liability to any one who shall, "as agent for another," keep or knowingly permit the keeping of a bawdy house in any house leased or controlled by him. The Court of Criminal Appeals has held that knowingly permitting the keeping of such a house is simply a method of committing the offense of "keeping," and is not in itself a distinct offense. Willis v. State, 34 Texas Criminal Reports, 148, 29 S. W., 787; Schulze v. State, 56 S. W., 918. Under this ruling, the evidence in relation to Blackmon would have made him subject to criminal prosecution for keeping a disorderly house by knowingly permitting it to be kept for that purpose. From the nature of the Act of 1907, which

comprises the articles we have quoted, it inevitably follows that any one subject to prosecution for keeping a bawdy house, under the Penal Code, is subject to an injunction, under article 4689, for the purpose of restraining such unlawful use of premises. It is hardly logical to conclude that this statute, enacted in aid of the criminal law, is narrower in its operation than the criminal statute, and is without application to one amenable to the criminal law on the same subject.

Whether the injunction rightfully issued against the defendant owner of the premises, who, prior to the institution of the suit, appears to have had no knowledge that they were being used for the wrongful purpose, presents a more difficult question; but after a careful consideration, in the light of general principles and the statute, we are convinced that she was, at least, a proper party to the proceeding, and the issuance of an injunction running against her, as well, was therefore not unauthorized.

If this had been a criminal prosecution against the owner, knowledge on her part of the unlawful use of the premises would clearly have been essential to justify conviction. But the proceeding was not of that nature. It was a civil suit for the suppression of a public nuisance by means of a civil remedy. The object of the statute would be defeated if the elements necessary to constitute the criminal offense must exist in order for it to apply. Its purpose was a broad one, and it should be given a construction which is consonant with that purpose.

At this place it is well to recur to the holding in Marsan v. French, 61 Texas, 173, 48 Am. Rep., 272, the opinion having been rendered by Judge Stayton,—a case wherein damages were sought against an owner of premises which it was charged he permitted to be used for purposes of prostitution to the injury of the plaintiff whose home was adjacent; and in which by the charge of the court a recovery for the plaintiff was authorized only upon its being proved to the satisfaction of the jury that the defendant not only let the premises to prostitutes knowing them to be such at the time, but that he rented them to such persons for such use, etc. In commenting upon the charge, it was said:

"This charge was more favorable to the appellant than a correct application of the law would justify. . . . The rules applied by the court in this case were such as would be applicable in a criminal prosecution for letting premises to be used as a place of prostitution, and it may well be questioned whether rules so stringent should be applied in civil causes in which questions of knowledge and intent are often of but little or of no importance."

It is the "use" of premises for the unlawful purpose named, habitual, actual, threatened or contemplated, at which article 4689 is leveled. It is such "use" which it is designed to prevent by the civil remedy which it supplies. It is altogether an impersonal statute. It is not a statute in relation to parties to suits, and does not attempt to prescribe who shall constitute the parties defendant to the injunction proceeding which it authorizes. It contains a provision, that any person who may

use or be about to use, or who may aid or abet any other person in the use of the premises for the wrongful purpose, *may* be made a defendant, but does not attempt to define only such persons as the proper parties defendant to the action. This provision can not be given the effect of an exclusive enumeration of those who may be made defendants in the proceeding. It has none of the marks of such an enumeration.

The purpose of the act from which article 4689 is taken, was to enlarge rather than supplant the general rules of law applicable to injunction suits of this nature. This is shown in the provision in article 4690, "that nothing in the above proviso contained shall prevent such injunction from issuing at the suit of any citizen of this State who may sue in his own name"; in placing at the disposal of the private citizen the remedy of injunction, without his being required to show that he is personally injured by the acts complained of; and by the further express declaration in the same article, that "the procedure in all cases brought hereunder shall be the same as in other suits for injunction, as near as may be." It can not be supposed that its intention was to deny the right to make or join as a party defendant in the suit one who, otherwise, would be a proper party.

The owner of premises is under a primary obligation to keep his premises from becoming a public nuisance. It is a common law duty. Joyce on Nuisances, sec. 453. It is frequently announced as a general rule that an owner is not liable for a nuisance created by his tenant of which he has no knowledge. But upon examination it will be found that this is a doctrine applied to private nuisances. And it may be doubted whether it is to be accepted without qualification in relation merely to private nuisances. Upon this question this is said in Marsan v. French:

"The maxim, 'so use your own property as not to injure the rights of another,' would seem to require that a landlord should at least use reasonable care and diligence in reference to the use which his property is applied, and that even for the negligence in this respect he might become responsible civilly for an injury which could not result if he exercised due care and due regard for the right of his neighbor."

We are not called upon in this case, however, to apply the rule in respect to the civil liability of an owner for the maintenance by a tenant of a private nuisance. The question here is merely as to the right to have an injunction run against an owner for the abatement of a public nuisance. In such a case it is difficult to perceive how the right is affected by the owner's previous want of knowledge that the premises constitute such a nuisance. No immunity from injunction against such use of the premises is created by the want of such knowledge on the owner's part. The right to an injunction arises upon proof of the nuisance, regardless of his knowledge or want of knowledge that his premises are being unlawfully used. It is not affected by the question of the owner's knowledge; and of course is not defeated by his want of knowledge. If it is established that the nuisance exists, it then be-

comes simply a question of against whom the writ of injunction may properly run.

While it is proper, and perhaps usual, to directly enjoin the immediate user of the premises in such cases, under what theory is the owner exempt from the writ? It is his duty to see that his premises are not applied to the unlawful use; and it is equally the right of the law to have him take such action as will prevent their being so used. The proceeding is not for the purpose of fastening any liability for the past use of the premises. The abatement of the nuisance by the prevention of their future unlawful use is, alone, its aim.

The owner's ignorance of the past unlawful use of his property does not relieve him of responsibility for its future use. He can not say that because he was unaware that it had become a public nuisance, the nuisance may not be restrained and its further existence prevented by an injunction running directly against him, requiring the exercise of his authority as the owner of the property, primarily charged with the duty, inhering in his ownership, of seeing that it is not devoted to unlawful purposes. If in such cases the owner may relegate the proceeding to an action simply against those directly responsible for the nuisance and others concerned with them, it means that they alone are charged with that duty and he is exempt from it. But the law does not protect persons in the ownership of property, and then permit them to absolve themselves from all obligation in respect to the uses to which it is applied. Ownership carries its duties as well as its benefits. One of them is to keep the property from a use which is unlawful. It is imposed upon the owner because that is where it ought to rest. It is an element of his right of control over the property, his authority to direct the purposes for which it may be used.

The operation of the writ of injunction against the owner of the premises as a means of preventing the continuance of a public nuisance maintained by a tenant, imposes upon him no hardship beyond that created by their unlawful use which it is his duty to abate. To the full extent that an injunction under this statute may accomplish the restraint of the nuisance, it may be employed. To have the writ run against the owner, thereby requiring him to relieve his premises of their unlawful use, is one method by which the purpose of the proceeding may be lawfully accomplished, and it is, therefore, not an improper way for the remedy to be applied.

In another view the joinder of the owner of the premises as a defendant in such a case, is warranted. The object of the injunction, if finally allowed, is to permanently enjoin the unlawful use of the premises. It is proper in the proceeding to have the owner before the court, so that, in the event the lease of the premises is terminated, he may be affected by the court's judgment perpetually restraining the continuance of the nuisance. O'Sullivan v. New York, etc., Co., 7 N. Y. Supp., 51.

The question presented was considered and determined by the Su-

preme Court of Iowa in Martin v. Blattner, 68 Iowa, 286, 25 N. W., 131;
·opinion on rehearing, 27 N. W., 244. It was a suit to restrain a public
nuisance, in which the owner of the premises was joined as a defendant
with the tenants, and where the owner was without any knowledge, prior
to the institution of the suit, that his premises were being unlawfully
used. The proceeding was under a statute of the same general character
as our own. It was urged in behalf of the owner that he was not
subject to an injunction in the case because of his want of any prior
knowledge of the wrongful use of the property. We quote from the
·opinion as follows:

"It must be assumed that Mr. Gibbs (the owner) leased the premises
for a lawful purpose, and that he did not have any knowledge, at the
time the injunction was asked, that his tenants had committed a statu-
tory nuisance thereon by selling intoxicating liquors contrary to law.
This being so, a petition for a rehearing has been filed upon the ground
that a landlord can not be made liable for a nuisance created by his
tenant of which he has no knowledge. Authorities are cited in support
of this doctrine, and we think, in a certain sense, it is undoubtedly true.
Cooley, Torts, 608-612·; Woods, Landl. & Ten., sec. 539. An examina-
tion of these authorities, and all others cited in notes therein, will·
demonstrate that·the doctrine above stated has been established in actions
to recover damages for the erection or continuance of private nuisances.
In such cases it has been generally held that a landlord is not liable
in damages that have been caused by nuisances created by his tenant,
·of which the landlord has no knowledge. This case is materially dif-
ferent. In the first place, this is a public nuisance, although the action
is brought by a private citizen under a statute which authorizes him
to bring this action. In the second .place it is not sought to recover
·damages for the past, but the sole object of the. action is to restrain and
prevent the nuisance in the future. When Mr. Gibbs was made a party
to the action, he obtained knowledge that it was claimed and charged
that his tenants had been using the leased premises as a place for the
·sale of intoxicating liquors, thereby creating a public nuisance, and there-
fore he, as the owner of the premises, or, rather, his property, under
the statute, would become liable as therein provided: This, at least,
should be regarded as sufficient to put him on inquiry as to the truth
of the matter charged. Not only so, but, as he was made a party and
.appeared in the action, he is chargeable with such knowledge, in rela-
tion to the existence of the nuisance as was established by the evidence
introduced on the trial. The court found and determined that a
nuisance existed, and, until this determination was reversed or set aside
in a lawful manner, it must be regarded as conclusive evidence of the
·existence of the nuisance, as against, not only the lessees, but also as to
the landlord.

"The statute provides that the 'building or erection, of whatever kind,
·or the ground itself in or upon which such unlawful manufacture or

sale, or keeping with intent to sell,  . . .  any intoxicating liquors, is carried on,  . . .  is hereby declared a nuisance, and shall be abated as hereinafter provided.  . . .  Any citizen of the county where such nuisance exists  . . .  may maintain an action in equity to abate and perpetually enjoin the same.' Chapter 143 of the Acts of the Twentieth General Assembly; Miller's Code, 411. Under this statute it seems to us that the building becomes a nuisance, and that its continuance as such may be enjoined and prevented. Such is, as we understand, the plain import of the statute.

"As we have seen, Mr. Gibbs obtained knowledge at the trial that his building was, under the statute, a public nuisance, and that a citizen acting for the public asked that it be enjoined. It seems to us clear that such a remedy existed as against him and his building. The statute, in express terms, so provides, and the court was bound to grant the relief asked. We affirm the proposition to be true, upon principle, that no one can use his property, or permit it to be used by another, so as to create a public nuisance. The right of the public in this respect is superior to that of the individual. The property of the latter must be held in subordination to the rights of the general public. The health and morals of the community so require. The existence of the nuisance having been conclusively established as between the parties to this action, and between each of them, by the judgment of the court, it necessarily follows that the tenants can not continue the business, or do the thing which created it, in the leased premises. The premises may continue to be occupied by them for lawful purposes, and the lease may continue to exist. Clearly, however, in our judgment, Mr. Gibbs can protect himself and his premises from being a public nuisance, and to that end he may have the power to cancel the lease, or enjoin the unlawful use. We, however, do not regard it as essential to determine this question. The petition for rehearing is overruled."

In our opinion the owner of the premises was a proper party to the suit, and on the finding of the court that the premises were being so used as to constitute them a public nuisance, she was subject to an injunction. The certified question is so answered.

(Associate Justice Hawkins dissenting.)

### DISSENTING OPINION.

MR. JUSTICE HAWKINS delivered the following dissenting opinion:

By the certified question of the Court of Civil Appeals set out in the opinion of the majority of this court by Chief Justice Phillips, relating solely to the Act of 1907, chapter 132, page 246, two inquiries are suggested: First, had the District Court jurisdiction and authority to grant this injunction, and, second, is its judgment supported by the evidence?

Our Legislature has seen fit to confer upon District Courts express statutory authority to enjoin the commission of certain specific offenses

against our criminal laws, said Act being one of that character. In enacting it the Legislature did not exceed its rightful powers, the matter being purely one of legislative discretion. "The Legislature, when not restrained by the Constitution of the State or that of the United States, has the power to make the law and to provide remedies for its enforcement. We find no express provision in either of these instruments which prohibits the law-making power from either extending or abridging equitable remedies." Ex parte Allison, 99 Texas, 462, 90 S. W., 870, 2 L. R. A. (N. S.), 111, 122 Am. St., 653; Ex parte Dupree, 101 Texas, 156, 105 S. W., 493; Mugler v. Kansas, 123 U. S., 623, 31 L. Ed., 205. The validity of said Act is not attacked. Excepting only the restrictive proviso in article 362a, Penal Code, article 504 (Revised Statutes, art. 4689), said Act is valid, and it will be so treated. Spence v. Fenchler (ante, p. 443), recently decided by this court; Ex parte Allison, 99 Texas, 455, 90 S. W., 870, 2 L. R. A. (N. S.), 1111, 122 Am. St., 653; Clopton v. State, 105 S. W., 994; Ex parte Morgan, 57 Texas Cr., 551, 124 S. W., 99; Ex parte Roper, 61 Texas Cr., 668, 134 S. W., 334; 9 R. C. L., p. 220.

Concededly, under the phraseology of the certified question, the contested issue in this case is restricted to and turns upon the construction to be given to certain injunction provisions of said statute.

Did the Legislature intend to make the injunction features of that statute as broad as the bawdy house and disorderly house evil with which its criminal provisions deal, or did it intend to limit such injunction provisions to only certain designated statutory phases of that evil, not embracing those which are disclosed by the ascertained facts of the case at bar? My associates seem to be of the former while I am of the latter view. They construe those injunction provisions very broadly, it seems to me; I construe them more strictly, for reasons which I will state.

Said statute embraces the following features, among others:

(a) It defines a "bawdy-house." Penal Code, article 496 (359).

(b) It defines a "disorderly house." Penal Code, articles 496 (359), 499 (360), 502 (362).

(c) It defines and denounces *several distinct and separate crimes or offenses,* and prescribes a penalty, as follows:

"Any person who shall, directly or as agent for another, or through any agent, keep or be concerned in keeping or aid or assist or abet in keeping, a bawdy house or a disorderly house, in any house, building, edifice or tenement, or shall knowingly permit the keeping of a bawdy house or a disorderly house in any house, building, edifice or tenement owned, leased, occupied or controlled by him, directly or as agent for another, or through any agent, shall be deemed guilty of keeping, or being concerned in keeping, or knowingly permitted to be kept, as the case may be, a bawdy house or a disorderly house, as the case may be, and, on conviction shall be punished by a fine of two hundred dollars, and by confinement in the county jail for twenty days for each day

he shall keep, be concerned in keeping or knowingly permit to be kept, such bawdy or disorderly house." Penal Code, art. 500 (361).

In this connection it should be noted, and constantly remembered, that while each offense so defined constitutes some particular phase of what, in a sense, is one general evil, or crime, and while the penalty is common to all those offenses, and while, therefore, the offenses named being misdemeanors and not felonies, any two or more of such offenses may be charged in one count of the same complaint, information or indictment, said offenses, nevertheless, are separate and distinct offenses in that evidence which will support a conviction for one such offense will not support a conviction for any other offense under that statute. This distinction, which I regard as material, is one which said majority opinion in this case in a great measure repudiates, or treats as immaterial; and from this point of divergence that opinion leads off into what I consider a morass of difficulty and error.

(d)    Said statute also provides:

"Any owner, lessee, or agent of either controlling the premises, having information that the premises are being kept, used or occupied as a bawdy or disorderly house, shall be held guilty of knowingly permitting the premises to be kept as a bawdy or disorderly house, as the case may be, unless he shall immediately proceed to prevent the keeping, using or occupying of such house, building, edifice or tenement for such purpose by giving such information to the county or district attorney, against the person or persons violating the provisions of this Act, or take such other action as may reasonably accomplish such result." Penal Code, art. 501.

"Any person who shall directly, as agent for another, or through an agent, knowingly employ or have in his service in any capacity in any theater, play-house, dance-house, or house where spirituous or malt liquors are kept for sale, any prostitute, lewd woman or women of bad reputation for chastity, or permit any such woman to display or conduct herself therein in an indecent manner, shall be guilty of keeping a disorderly house, and shall be punished by a fine of not less than one hundred nor more than five hundred dollars, and by confinement in the county jail for twenty days for each day that such person is kept in service or employed or permitted to display or conduct herself as hereinbefore provided." Penal Code, art. 502 (362).

"The habitual, actual, threatened or contemplated use of any premises, place, building, or part thereof, for the purpose of keeping, being interested in, aiding or abeting the keeping of a bawdy or disorderly house, shall be enjoined at the suit of either the State or any citizen thereof." Penal Code, art. 503 (362a).

"Any person who may use, or who may be about to use, or who may aid or abet any other person in the use of any premises, place or building, or part thereof, may be made a party defendant in such suit." Penal Code, art. 504, the quoted language being followed by a proviso which is inoperative. Spence v. Fenchler, *supra*.

"The Attorney General and the several district and county attorneys shall institute and prosecute all suits that said Attorney General, or such district or county attorney, may deem necessary to enjoin such use; provided, that such suit may be brought and prosecuted by any one of such officers; and provided further, that nothing in the above proviso contained shall prevent such injunction from issuing at the suit of any citizen of this State who may sue in his own name, and such citizen shall not be required to show that he is personally injured by the acts complained of." Penal Code, art. 505.

The provisions relating to injunction appear, also, in articles 4689-90, Revised Statutes, 1911.

It is too plain for argument that in the case at bar under the recognized facts, as set out in the certificate, the agent can not be reached by such statutory injunction unless the injunction features of said statute be construed as embracing one who *knowingly permits,* etc., although article 362a (now article 503) does not expressly include him; and it is likewise evident that the owner can not be included by such statutory injunction unless that article be construed as going still further and as extending beyond all the said statutory offenses and as embracing a person who, clearly, is not guilty of any criminal offense, or phase thereof, denounced by said Act, or by any other portion of our Penal Code, and who, furthermore, had neither knowledge nor actual notice of the illegal use of the premises which she, through her agent, had leased to the sole active offender, the tenant.

Upon an extended and very careful consideration of this statute, and of practically all accessible authorities, textbooks and decisions, bearing upon the general subject, I am unable to bring my mind to the conclusion that the Legislature meant to extend so far the equitable powers of the chancellor.

In this instance it happens that the action for injunction is in behalf of the State; but, of course, the construction now placed, by this court, upon said Act, will apply as well, and serve as a precedent, in similar actions by citizens under this statute.

So far as I have been able to find, by diligent search among the textbooks, the digests and encyclopedies, and the decisions of courts upon both sides of the Atlantic, the decision of my associates in the case at bar approves a judgment of a trial court which constitutes the broadest exercise of judicial power in such matters ever spread upon any court record in the English language, whether under the common law, or under a statute specifically authorizing an injunction to restrain the "use" of premises for either bawdy or disorderly house purposes.

Admittedly, at common law keeping a bawdy house was a common or public nuisance, and was indictable. Hawkins' Pleas of the Crown, vol. 1, p. 692, sec. 6, citing 3 Inst. 205; 4 Black. Com., pp. 167-8. See, also: Bacon's Abridgment, vol. 7, p. 234; 1 Russell on Crimes, pp. 739-740.

"At common law a 'bawdy house' or a house of 'ill-fame,' in the

popular sense of the terms, is a species of disorderly house, and is indictable as a nuisance." Henson v. State, 62 Md., 231; 50 Am. Rep., 204, citing 3 Greenleaf's Ev., sec. 184, 2 Wharton's Cr. L., sec. 2392.

Such has always been the rule throughout the United States. 14 Cyc., 484, note 16; Weakley v. Page (Tenn.), 46 L. R. A., 558.

"The repeated, continuous and persistent violations of the statute are what makes them nuisances, independent of the express terms of the statute declaring them to be such. Indeed, we would think that every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated is a public nuisance." State v. Crawford, 28 Kans., 733, 42 Am. Rep., 182, and cases cited; Weakley v. Page, *supra.*

Yet never, so far as I can find, in an action under the common law on behalf of the crown or a State, has any English-speaking court issued a writ of injunction to restrain the maintenance of either a bawdy house or a disorderly house, although the opinions in some English and in many American cases abstractly define the equitable powers of the courts in terms broad enough to include an injunction of that character. I do not say courts of equity have not, nor that they have that power or authority, under the common law, that point not being embraced by the certified question. I allude to the fact, as I understand it to be, merely to emphasize my view that this injunction statute was probably not intended by the Legislature to be construed as going beyond the boundaries of the language therein actually employed. It is to be presumed that the Legislature understood its ordinary meaning.

With advantage, perhaps, that thought may be pursued further. At common law the equity powers of courts were never exercised for the sole purpose of preventing crime. Attorney General v. Sheffield Gas Co., 19 Eng. Law & Equity Rep., 643; Lawrence v. Smith, 1 Jacob, 471-3; Mayor of Hudson v. Thorne, 7 Paige, 261; 4 Black. Com., chap. 18.

Blackstone, in treating "Of the Means of Preventing Offenses" (book 4, chap. 18), said: "This preventive justice consists in obliging those persons whom there is probably ground to suspect of future misbehavior, to stipulate with and to give full assurance to the public that such offense as is apprehended shall not happen; by finding pledges or securities for keeping the peace, or for their good behavior."

And in discussing nuisances Blackstone said:

"Let us next attend to the remedies, which the law has given for the injury of nuisance. And here I must premise that the law gives no *private* remedy for anything but a *private* wrong. Therefore, no *action* lies for a public or common nuisance, but an *indictment* only; because, the damage being common to *all* the king's subjects, no *one* can assign his particular proportion of it; or if he could, it would be extremely hard if every subject in the kingdom were allowed to harrass the offender with separate actions. For this reason, no person natural or corporate, can have an action for a public nuisance, or punish it; but only the

king in his public capacity of supreme governor, and *pater-familias* of the kingdom. Yet this rule admits of one exception; where a private person suffers some extraordinary damage, beyond the rest of the king's subjects, by a public nuisance, in which case he shall have a private satisfaction by action."

He then points out that since the action of *assize of nuisance,* as well as the action of *quod permittat prosternere,* in each of which the plaintiff was allowed judgment for the abatement of the nuisance and for damages, had been abandoned, the only remaining action *by the individual* was one *"on the case* for damages; in which the party injured shall only recover a satisfaction for the injuries sustained; but can not thereby remove the nuisance." Black. Com., book III, chap. 13.

Lord Eldon said, in 1822, in a suit for injunction to restrain infringement of a copyright: "This court has no jurisdiction in matters of crime. . . . I have nothing to do with it as a crime. The question relates only to a civil right of property." Lawrence v. Smith, 1 Jacob, 473. In Soltau v. De Held, 2 Sim. R. N. S., 154, decided in 1851, Vice-Chancellor Kindersley said: "I am not to grant an injunction to restrain an illegal act merely because it is illegal. I could not grant an injunction to restrain a man from smuggling, which is an illegal act. If it be illegal, the illegality of it is no ground for my interfering."

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to rights of property. It has no jurisdiction over the prosecution, the punishment or the pardon of crimes and misdemeanors." Ex parte Sawyer, 124 U. S., 200, 31 L. Ed., 402.

"Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court." In re Debs, 158 U. S., 593, 39 L. Ed., 1092.

"Neither will equity restrain a nuisance on any idea that it is a crime." Bishop's New Crim. Pro., vol. 1, par. 1417, and cases cited

"Equity had no criminal jurisdiction and acts or omissions will not be enjoined merely on the ground that they constitute a violation of law and are punishable as crimes." 22 Cyc., p. 902, and numerous English and American cases cited in note 35.

That public gambling could not be enjoined, as our law then stood, was held by our Court of Civil Appeals for the Fourth District, in State v. Patterson, 14 Texas Civ. App., 465, 37 S. W., 478. The Supreme Court of Colorado approved and followed it in a similar case. People v. District Court, 26 Colo., 386, 58 Pac., 604, 46 L. R. A., 850.

The same principle was reaffirmed by the same Court of Civil Appeals in a suit to enjoin one from keeping a barber shop open on Sunday in violation of article 196 of our Penal Code. York v. Yzaguirre, 31 Texas Civ. App., 26, 71 S. W., 563.

See, generally: McDonald v. Denton, 132 S. W., 823, and cases

cited; Ex parte Warfield, 40 Texas Cr. R., 413, 50 S. W., 933, 76 Am. St., 724; Ex parte Roper, 61 Texas Cr. R., 68, 134 S. W., 334; Hamilton-Brown Shoe Co. v. Saxey, 131 Mo., 212, 32 S. W., 1108, 52 Am. St., 622.

However, it is generally held that, in proper cases, for the protection of public or private property rights and other civil rights, equity will enjoin certain acts, even though they constitute crimes denounced by the Penal Code. State v. Goodnight, 70 Texas, 687, 11 S. W., 119, and cases cited; State v. Patterson, *supra;* Weakley v. Page, 102 Tenn., 178, 46 L. R. A., 558, and cases cited; People v. St. Louis, 5 Gilman, 10 Ill., 351, 48 Am. Dec., 339; Hamilton-Brown Shoe Co. v. Saxey, 131 Mo., 212, 52 Am. St., 622, 32 S. W., 1106; 22 Cyc., 902, note 37.

For a long time it was generally held that where an individual seeks an injunction against a public nuisance he must show injury special to himself. Black. Com., book 4, chap. 13, *supra;* Attorney General v. Forbes, 2 Mylne & Craig, 131; Sampson v. Smith, 8 Sim., 275; Weakley v. Page, 102 Tenn., 178, 53 S. W., 551, 46 L. R. A., 552; Corning v. Lowerie, 6 Johns. Chan., 439; State v. Patterson, 14 Texas Civ. App., 465, 37 S. W., 478; Hughes v. Heiser, 1 Bin. (Pa.), 463, 2 Am. Dec., 459; Pittsburg v. Scott, 1 Pa., 309; Broadbent v. Imperial Gas Co., 26 Law J. Chan., 276; Solteau v. De Held, 2 Sim. R. N. S., 154; Francis v. Schoellkopf, 53 N. Y., 155.

Frequently it has been held that a suit by an individual to enjoin a public nuisance will not be entertained unless it be alleged that plaintiff will sustain a special or peculiar damage from it, an injury distinct from that done to the public at large. Bigelow v. Hartford Bridge Co., 14 Conn., 565, 36 Am. Dec., 502, and cases cited.

"The principle has long been settled that the objection that the nuisance is a common one is not available, if it be shown that special damage was suffered," citing cases. Cranford v. Tyrrell, 128 N. Y., 344, 28 N. E., 514.

"The principle, then, is that in case of a public nuisance, where a bill is filed by a private person, asking for relief by way of prevention, the plaintiff can not maintain a stand in a court of equity unless he avers and proves some special injury." City of Georgetown v. Alexandria Canal Co., 12 Pet., 91, 9 L. Ed., 1012. Within that rule was Marsan v. French, 61 Texas, 173, 48 Am. Rep., 272.

But that doctrine has been held too restrictive. In Whitfield v. Rogers, 26 Miss., 84, 59 Am. Dec., 244, it was said: "It is well settled that a private individual may obtain an injunction to prevent a public mischief by which he is affected in common with others," citing Eden on Inj., 267.

Equity will interfere in such cases "upon the application of private parties directly affected by the nuisance." 2 Story's Eq. Jur., sec. 924; City of Georgetown v. Alexandria Canal Co., 12 Pet., 91, 9 L. Ed., 1012.

The distinction between the rule applicable to private nuisances and that appliable to public nuisances has been stated thus: "Any person

who is injured by a private nuisance may abate it; and a public nuisance may be abated by any one, even though it may not have occasioned any special damage or inconvenience to him individually." Gates v. Blincoe, 2 Dana (Ky.), 158, 26 Am. Dec., 440.

The proper disposition of this case does not call for any determination as to which of the foregoing propositions and decisions thereon are sound, and which are not sound; they are material herein merely in so far as it is to be presumed that they were known to our law-makers, and in so far as it is reasonable to presume that with such knowledge of the status of the decisions and such lack of decisions on the general subject they would probably say just what they meant, and that they meant precisely what they said and no more, in framing, for the first time, in this State, a statute authorizing injunctions relating to bawdy houses and disorderly houses, and providing for such suits by the State, not only by the Attorney General but by district attorneys and county attorneys as well, and providing also for such suits by "any citizen of the State," and that "such citizen shall not be required to show that he is personally injured by the acts complained of."

Said statute having been enacted under such circumstances, instinctively, and as a matter of mature judgment, I am unwilling to go with my associates as far as they go in construing it, in the absence of any clear and definite provision specifically authorizing the chancellor to enter such decree upon such facts as the certificate here discloses.

Weighty reasons, founded upon considerations of public policy, may be advanced to show that it would have been wise and proper for the Legislature to have framed this statute upon such broader basis, and in such explicit language as to obviate all questions concerning its purpose, and some of those reasons appear in said majority opinion; but the soundness of that contention may be conceded without touching the real question now before this court, which is: Under established rules for construction of statutes, will the language actually employed in this statute reasonably bear the broader construction which my associates give to it?

That question is not free from difficulty; and, doubtless, it was because of that fact that the Court of Civil Appeals, when called upon, as it was in this case, to place that broader construction upon the statute, hesitated and refrained from doing so, in the absence of the sanction of this court of last resort in such matters: hence the certified question.

Justly and properly, neither the grounds for injunction under said statute, nor the classification or designation of defendants in actions therefor, can be extended or enlarged by the courts, by construction, for the purpose of conserving even a sound public policy relating to suppression of crime; to do so would amount to an unwarranted invasion of the sphere and powers of a co-ordinate department; consequently, this statute should be construed in accordance with the long established and well recognized rules of statutory construction which must be as-

sumed to have been in the minds of those who made this law when they framed and adopted it.

Accordingly, I will now undertake to state, and to apply to said statute and to the facts of the case at bar, the rules which I consider applicable; and, in so doing, will consider said original Act of 1907 as a whole. Sec. 16, Final Title, Rev. Stats., 1911.

I think the injunction provisions of said Act should be construed strictly, first, because they confer jurisdiction over subject matter and parties, and, second, because they authorize summary proceedings. Western & Atl. Ry. v. Atlanta, 113 Ga., 537, 54 L. R. A., 294, 38 S. E., 996.

"Acts giving summary remedy, out of the ordinary course of judicial proceedings, should be strictly construed, and confined to the cases clearly contemplated." Hale v. Burton (Ga.), Dudley, 105.

"Statutes which provide new and extraordinary remedies must be construed strictly, both as to the cases embraced within their terms and as to the methods to be pursued." 36 Cyc., p. 1189.

"All statutes authorizing summary proceedings must be strictly construed, and strict conformity to the statute, in the exercise of the jurisdiction it confers, is essential to the regularity and validity of the proceedings." 36 Cyc., p. 1189.

"Where the jurisdiction given by the statute is clearly a summary one, it is the universal rule in this country, as well as in England, that the provisions of the statute are to be strictly construed." Endlich on Int. of Stats., sec. 158, citing Davison v. Gill, 1 East, 64. See, also: Sutherland, Stat. Const. (2nd ed.), vol. 2, secs. 564-5; DeWitt v. Dunn, 15 Texas, 105; De la Garza v. Booth, 28 Texas, 478, 91 Am. Dec., 328; Scogins v. Perry, 46 Texas, 111; Robinson v. Schmidt, 48 Texas, 13; Keller v. Corpus Christi, 50 Texas, 614, 32 Am. Rep., 613; Spence v. McGowan, 53 Texas, 30; Murray & Bro. v. Gulf, C. & S. F. Ry. Co., 63 Texas, 407, 51 Am. Rep., 650; Schloss v. Ry., 85 Texas, 601, 22 S. W., 1014; Crowder v. Fletcher, 80 Ala., 219; Welman v. Harris, Ga. Dec., 63, pt. 2; in re Norwegian Street, 81 Pa. St., 349.

Applying said well settled rules of construction, my conception of the genesis, purpose and legal effect of said statute is: The Legislature denounced, as crimes, certain things relating to the maintenance of bawdy houses and of disorderly houses, framing the penal provisions of the statute in such manner, however, as to subdivide the offense into specific phases, each admitting of, though not requiring, separate allegation, and each requiring corresponding proof, although each is punishable by the exaction of a common misdemeanor penalty, by reason of which facts any number or all of such phases or subdivisions of the misdemeanor may be charged, conjunctively, in one count of the same indictment; then the Legislature, recognizing the necessity for the aid of equity in suppressing the evil, added the summary remedy of injunction, but, in doing so, designedly framed the injunction provisions of the statute in such manner as to cover only certain enumerated phases of

the denounced offense, and to omit other phases thereof. In short, I think that in framing the operative injunction features of the Act the Legislature intentionally followed the ramifications of the penal provisions of the Act, step by step, and phase by phase of the stated offense, except that at least two of them, including *knowingly permitting,* etc., were not thereby embraced, but were omitted, purposely, and that, in enumerating who may be made defendants in actions for injunction, the Act designedly made corresponding omissions, thereby making clear and emphasizing the legislative purpose to exclude from the injunction features of the Act those omitted phases of the offense.

Evidently the Legislature did not attempt, by that statute, to make the equity powers of the court as broad as the sweep of our Penal Code relating to bawdy houses and disorderly houses, or even as broad as the penal provisions of said Act of 1907 relating to that subject. For instance: "procuring," etc., is an offense which said Act added, as article 359a, to those theretofore defined by our Penal Code, and which is punishable by both fine and imprisonment. Art. 498, P. C., 1911; Fletcher v. State (Texas Cr. App.), 179 S. W., 879. Said article 359a thereby took its place in our Penal Code immediately above article 360 (now article 499), which is as follows:

"Any room or part of a building or other place appropriated or used for either of the purposes above enumerated is a disorderly house within the meaning of this chapter."

Yet, it is obvious, I think, that said Act of 1907 does not authorize an injunction for the express purpose of preventing the commission of the criminal offense of "procuring," etc., and such offender would not be within its injunction provisions except, possibly, in so far as his acts might constitute him an *aider* or *abetter,* or one *interested,* in the keeping of a disorderly house.

Now, that exception being established, it is natural and logical to suppose that there may be some other penal offense denounced by said Act, or phase thereof, over which the statute fails to extend the equitable powers of the court, even though therein the offender be declared subject to pains and penalties otherwise than by injunction.

Likewise, *knowingly permitting* the keeping of a bawdy house or a disorderly house, under stated circumstances, is itself, by article 361 (now article 500), constituted a substantive offense, or, at least, a separate and distinct way of committing an offense embraced in the general definition set forth in that article, and it, also, is punishable by both fine and imprisonment; but there, as in the matter of "procuring," etc., the statute does not provide, expressly, that *knowingly permitting* the commision of the offense may be enjoined. Does the Act carry, *by implication,* provision for an injunction against an agent under such circumstances, or against an owner of the premises who, down to the filing of the suit for injunction, had no knowledge or actual notice of the illegal use of the premises? I think not. See art. 362 (now art. 502).

Clearly, in the absence of such knowledge or notice the owner could not be convicted of the penal offense of *knowingly permitting,* etc.; consequently she can not be enjoined as one guilty of that phase of the statutory offense, even if it be held included, by implication, by the injunction provisions of the Act.

Furthermore, our statute does not declare the ground, or the house, so being used, a nuisance, and provide, in general terms, for abatement thereof, by injunction, as did the Iowa statute under which Martin v. Blattner, 68 Iowa, 286, 25 N. W., 131, 27 N. W., 244, arose.

Under the phraseology relating to injunction, set out in the caption and in the body of our statute, it is the "use" of any premises, place, building, or part thereof, for certain designated immoral and illegal purposes, and only such "use," for such purposes only, which is hereby expressly made the grounds or basis for an injunction; and, it is, I think, only those who are, or who are about to become, in some sense, active *users* of the property for such inhibited purpose, who are either necessary or proper parties, under the terms of our statute, in an action for such an injunction. Why should one who does not "use," or contemplate using, property for a particular purpose be enjoined from "using" that property for that purpose? Why should any one be enjoined from doing that which he is neither doing nor thinking of doing?

The "use" which may be enjoined may be "habitual, actual, threatened or contemplated"; it may be "of any premises, place, building or part thereof"; but it *must* be for the purpose of (1) "keeping," or (2) "being interested in . . . *the keeping,*" or, (3) "aiding in . . . *the keeping,*" or, (4) "abetting *the keeping*" of a "bawdy or disorderly house"; so the element of "use" for some one or more of those designated purposes is a component and essential part of each and every proposition of fact and of each and every act and status to which the injunction features of the Act are therein expressly made applicable. The word "purpose" in article 362a (now article 503), is qualified, in turn, by the phrases "of keeping," "of being interested in," "of aiding," and "of abetting," the keeping of a "bawdy or disorderly house." Separately and together those phrases restrict the "purpose," and help to define and illustrate the "use" which is within the contemplation of those portions of the Act which relate to injunctions. And, then, as if to firmly rivet that meaning, and insure that construction of the Act, the Legislature specifically declares who may be made defendants in such injunction suits, and in so doing follows the phraseology of that portion of the Act which defines the offenses which may be enjoined, and includes within that enumeration of parties none except "any person who may *use,* or who may be about to *use,* or who may aid or abet any other person in the *use* of any premises, place or building or part thereof," for some one of the inhibited purposes, the word "use" being therein repeatedly employed with reference, and only with reference, to the "purpose" so defined and restricted in the first paragraph of article 362a (now article 503).

"Use" has been thus defined: "To employ for the accomplishment of a purpose; turn to account; make use of; as, to use tools; he used a sword." New Standard Dictionary. "To make use of; to convert to one's service; to avail one's self of; to employ; as, to use a plow, a chair, a book." Webster's New International Dictionary. These definitions suggest the sense in which the word "use" is employed, or *used,* in this statute.

For what reason, if not to restrict to the particular "uses" specially mentioned in article 362 (now article 502) was any enumeration of bawdy house or of disorderly house purposes made therein? The general terms would have been simpler and all-inclusive. And why, if not with the same purpose of restricting the operation of the injunction features of the statute, did the Act set out an enumeration of the classes of persons who may be joined in the action as defendants, and why do such enumerations of uses, purposes and defendants exactly correspond?

It is very significant, I think, that in specifically enumerating the penal offenses, or phases thereof, to be enjoined, the Act distinctly fails, (a) to mention, in express terms, either "procuring," etc., or "knowingly permitting," etc., although each, by that Act, is constituted a misdemeanor, under heavy penalty, and also distinctly and *correspondingly* fails, (b) to mention, or designate as a necessary or proper party defendant, either *one who "procures,"* etc., or *one who "knowingly permits,"* etc. Why either omission, and why do they correspond, exactly, like the tongue and the groove, if they were not intended to fit each other, and if they were not meant to exempt those offenses from the injunction features of the Act? It is noticeable that in the portions of said statute relating to injunction there is an utter absence of the word "owner" or "agent," or any other term aptly designating one who may commit said offense of "knowingly permitting," etc., although, in defining penal offenses involving "knowingly permitting," etc., this statute, in two instances, in article 361 (now article 500), and again in article 362 (now article 501) does distinctly employ the word "owner" and also the word "agent," or some word of identical import. Why this striking contrast in phraseology, if not to mark and emphasize a transition, so far as these offenses, or phases of an offense, are concerned, between the treatment thereof under the penal provisions and the treatment thereof under the injunction provisions of that statute?

Moreover, the same distinction is clearly indicated, if not conclusively shown, by the caption, or title, of said Act. Among the purposes declared therein are these: "Stating who shall be guilty of the offense of keeping, being concerned in keeping or *permitting* to be kept, a bawdy house and a disorderly house, and prescribing the punishment therefor; also by adding articles 362a and 362b, to prevent, by means of the writ of injunction, the habitual, actual, contemplated or threatened use of any premises, place, building or part thereof, for the purpose of keeping or being in any manner interested in or *responsible* for the keeping of a bawdy house or disorderly house," etc. (Italics mine.)

The words "permitting to be kept" are therein restricted to articles defining penal offenses, and neither those words nor equivalent terms are used, in the caption, with reference to the added articles relating to injunction. The words "responsible for the keeping," as used in the caption, in relation to injunctions, clearly refer to some character of *active* participation in the crime, such as "aiding" or "abetting" in the commission of the offense, and do not include a merely *passive* attitude, such as "knowingly permitting" the commission of the offense.

"Responsible" has been thus defined: "Answerable, as for an act performed, or its consequences; . . . accountable; . . . with regard to the legal use of the word, two conceptions are often confused —namely, that of the potential condition of being bound to answer or respond in case a wrong should occur, and that of the actual condition of being bound to respond because a wrong has occurred. For the first of these *responsible* is properly used, and for the second *liable.*" Cent. Dict.

Beyond a reasonable doubt, it seems to me, the "wrong" to which "responsible," as used in said caption, refers, is only some "wrong" or crime denounced by said statute, in which the party to be enjoined has actively participated, or is about to actively participate. But, even if I am wrong in that conclusion, and if "responsible" is broad enough to include the wrong of "knowingly permitting," etc., I can not comprehend how it can possibly include one who is neither legally nor morally guilty of any crime or wrong denounced by said statute, as, for instance, an owner without knowledge or notice of the illegal use of the leased premises. Why should one in that status of innocence be subjected to the humiliating notoriety and expense of such a suit for injunction, unless that be reasonably necessary to stop the evil? The Legislature seems not to have considered it necessary or wise.

The change from "permitting to be kept," in the portion of the caption relating to penal provisions, to "responsible for the keeping," in the portion of the caption relating to injunctions, indicates, too clearly for argument, that some difference in meaning was contemplated; and, since the former term carried the idea of *mere passive acquiescence* in the crime, I conclude that the latter term was intended to carry the idea of some kind of *active participation* therein. Besides that, the language of the caption is, "responsible for the keeping," etc., and not responsible for *knowingly permitting to be kept.*

Here, again, the change in phraseology is such as to exempt from the injunction features of the Act the crime of "knowingly permitting," etc. The framework and phraseology of the statute are responsive to my view of the caption, and furnish what I consider convincing proof that the Legislature understood it as I do. Indeed, I gravely doubt whether the caption is broad enough to include an injunction against either of the defendants under the facts of the case at bar.

Three times in that Act did the Legislature clearly indicate its purpose not to authorize an injunction against one who merely "knowingly

permits" the commission of the offense; first, in the caption, second, in the enumeration of the offenses which may be enjoined by virtue of that Act, and, third, in the designation of parties defendant in actions for injunction thereunder. When the Act as a whole is considered, and when it is remembered that it both confers jurisdiction and provides a remedy of a summary nature, it seems to me that both the enumeration of offenses which may be enjoined by virtue of its provisions, and the corresponding enumeration of classes of persons who may be made defendants in suits for injunction under said Act, were intended to be exhaustive, excluding all other offenses and all other defendants. To those provisions should be applied the maxim, "Expressio unius est exclusio alterius."

In discussing that maxim, Lewis' Sutherland Stat. Const. (2nd ed.), vol. 2, sec. 491, says: "What is expressed is exclusive only when it is creative, or in derogation of some existing law, or of some provisions of the particular Act. The maxim is applicable to a statutory provision which grants originally a power or right. In such cases the power or right originates with the statute, and exists only to the extent plainly granted. . . . Where a statute gives a new right and prescribes a particular remedy, such remedy must be strictly pursued, and the party is confined to that remedy"; citing cases. . . . "When a statute, defining an offense, designates one class of persons as subject to its penalties, all other persons are deemed to be exempted"; citing State v. Jaeger, 63 Mo., 403.

Said Act of 1907 seems to have been the first statute of this State to specifically authorize an injunction in behalf of the State, or in behalf of or in an action by an individual, to restrain any phase of the bawdy house or disorderly house evil. It was also the first, in this State, to confer upon *an individual* this statutory right to enjoin a house of that character without alleging and proving that by such maintenance his property was "injured" or damaged. Said Act in strongly penal in its nature.

As to the applicability of said maxim, see, also: Bryan v. Sundberg, 5 Texas, 418; Mercien v. Burton, 17 Texas, 206; Seibert v. Richardson, 86 Texas, 295, 24 S. W., 261; Watkins v. Wassell, 20 Ark., 410; Broom's Maxims, 8th ed., 650, citing Gregory v. Des Agnes, 3 Bing. N. C., 85 (32 E. C. L. R.); Watkins v. Railway Co., 16 Q. B., 961 (71 E. C. L. R.); Reg. v. Railway, 16 Q. B., 31 (81 E. C. L. R.).

A careful study of the entire Act has convinced me that the purpose of the Legislature, in its enactment, was definitely and unequivocally to authorize courts of competent jurisdiction to deal, by process of injunction, with only certain phases of the bawdy and disorderly house evil, as denounced by said Act, and, in such instances, to do so, not *indirectly,* as by moving upon owners or agents to prevent them from *knowingly permitting* such evil practices upon premises under their general control by virtue of ownership, but *directly,* by leveling writs of injunction against those who may actually use, or be about to actually

use, or who may be interested in, or who may aid or abet, or be about to. aid or abet, another person in such actual use, of any premises, place, building or part thereof for such bawdy or disorderly house purpose.

It is true that, in general terms, the "use" of premises for an illegal purpose is what the injunction was designed to prevent or stop; but the Legislature seems to have thought that result may be accomplished, practically, by criminal prosecutions against all offenders, including both owner and agent who may *knowingly permit* the commission of the crime, at least when coupled with an injunction *directly* against the tenant, or other person or persons in actual and immediate use and control of such premises, and in direct charge and control of the nefarious business, and against any and all persons who, directly, or as agent, or through an agent, may be interested in, or who may aid or abet such use thereof, or contemplate same, and without including in the injunction either an agent who, as in this case, has no actual usé or immediate control of such premises, and who had not been interested in, nor aided, nor abetted in such use thereof, and does not contemplate any such thing, or an owner who did not even know, as a matter of fact, and had not been notified, that there had been any violation of the stipulation in the lease against use of her property for any immoral purpose, even though there be evidence to support a finding that the agent knowingly permitted such use of the leased premises. As to an owner and agent, so circumstanced, this statute spends all its force in defining offenses and providing punishment therefor, *in criminal actions,* limiting them to instances of active participation or conscious sufferance, and does not at all undertake to deal with them by means of injunction. It would have been easy for the Legislature to make the injunction provisions of this Act as broad as its penal provisions, had it so desired, and·even to have made it expressly applicable to *owners* in cases like this one. It does not certainly or even fairly extend the injunction provisions of the statute to include either the agent, by reason of his *knowingly permitting* the commission of said offense, or the owner, under the conceded facts of this case; and I think this court is without authority to extend the equitable jurisdiction of the trial court, under the statute, beyond the ordinary meaning of the words of the Act, to such extent as will include the defendants, under said facts, even though that would cure a possible omission by the Legislature. I am particularly unwilling to extend, or enlarge, by construction, a statutory power to issue injunctions, and especially so when it is for the purpose of restraining the commission of a statutory offense, or abating an evil which is denounced by the Penal Code under penalty of fine and imprisonment, the general policy of English and American and Texas jurisprudence being to look to the due enforcement of our criminal laws for the suppression of crime.

It has been suggested that the employment by the Legislature of only general and purely impersonal terms in the first paragraph of article 362a (now article 503) evidences an intention to so define and fix the

equity jurisdiction of the trial court as to authorize it to issue injunctions to prevent violation of any and all of the provisions of said Act which relate to bawdy or disorderly houses, and to embrace within the scope and effect of such injunctions all who may in any way, or to any extent, as owner, agent or tenant, or otherwise, directly or indirectly, interfere with the due observance of articles 359 (now article 496) and 361 (now article 500), or be concerned in or "knowingly permit" such use of said premises, etc. And, apparently, as part of the same idea, it has been suggested that by the provision "any person who may use, or who may be about to use, or who may aid or abet any other person in the use of any premises, place or building, or part thereof, may be made a party defendant in said suit," the Legislature meant to enlarge the classes of persons who were subject to the operation of and could be enjoined under the first paragraph of article 362a (now art 503).

Neither suggestion seems well founded. If the first paragraph of article 503 were construed in accordance with said first suggestion, such injunctions might, indeed, well embrace all persons included within the enumeration of defendants set out in the second paragraph of that article, and referred to in said second suggestion, but, under that construction there would be no need for any such designation of additional classes of defendants.

However, it is precisely such "use" of the premises by owner and agent, or either, as I consider within the injunction features of said statute, that is inhibited by the terms of the order or judgment of the District Court in this case. Upon its face said judgment is, therefore, in my opinion, one clearly within the statutory jurisdiction and authority of that court, by virtue of said Act of 1907; and, inasmuch as said judgment appears to be regular and valid, it should be upheld and enforced, unless it was entered without any legal evidence whatever to support it. Moreover, said judgment being by a court having, under some of the injunction provisions of said Act, jurisdiction over the subject matter and the parties, the presumption, in the absence of a finding or statement of facts to the contrary, would be that there was presented to the trial court, upon the hearing, some legal evidence which, excluding all contradictory evidence, if any, would justify and support that judgment, as entered. But in this case that presumption is destroyed by the facts as they are presented to this court in the certificate from the Court of Civil Apeals, and the "statement of facts" sent up from the trial court, which is referred to in, and in effect made part of, said certificate—a practice which can not be commended. Rev. Stats., 1911, art. 1619; art. 1543, as amended by Acts of 1913, p. 107; Evans v. Daniel, 94 Texas, 283, 60 S. W., 309. Substantially the facts appear in the certificate; there is no conflict between the two papers.

The facts, as shown, are that a tenant occupied and used the house, under a written lease which stipulated that it was to be used as a hotel and rooming house, and not for any immoral purpose, but that it is a

bawdy house, although there was no "use," habitual, actual, threatened or contemplated, by either the owner or the agent, of said house or any part thereof, for any purpose whatever, and that neither agent nor owner had anything to do, as a matter of fact, with the actual conduct, control, or management of such premises or business.

The agent, Blackmon, testified, without contradiction, that, after having been informed by the county attorney that the house was being used for immoral purposes, he, Blackmon, notified the tenant that such use was contrary to the terms of the lease and would not be tolerated, and that he, Blackmon, conferred with the county attorney's office about the matter, and told that officer that if said report were proven true, he, Blackmon, would help prosecute the tenant; also that he, Blackmon, investigated said report and concluded that it was not true.

For the defendants, then, the worst phase of the evidence is that, as stated in the certificate, it would support the finding that the agent "knowingly permitted" the inhibited use of the house. As to the owner, the uncontradicted evidence and the statement by the Court of Civil Appeals, alike, are to the effect that she had no connection whatever with the keeping of the house, and did not know or have actual notice that the house was being used or would be used for any illegal purpose. There is no suggestion or intimation whatever that any such use had ever been or then was contemplated by her.

The essential element of "use" of said building, or part thereof, for any purpose, *by the owner, or by the agent,* being thus entirely absent from this case, the "purpose" of any "use" thereof (if "use" could be assumed), and the legality or illegality of that "use" or "purpose," are no longer proper subjects of inquiry in this proceeding for an injunction. However, if they were, the uncontradicted evidence clearly negatives the idea that either *owner or agent* ever had or harbored any "purpose of keeping, being interested in, aiding or abetting the keeping of a bawdy or disorderly house" in said building or any part thereof, the legal effect of those statutory items being well established in harmony with my views herein. Schackey v. State, 41 Texas Cr. App., 255, 53 S. W., 877; Carlton v. State (Texas Cr. App.), 51 S. W., 213; Tracy v. State, 42 Texas Cr. App., 404, 61 S. W., 127; Nelson v. Territory, 5 Okla., 512, 49 Pac., 920; People v. Rice, 103 Mich., 350, 61 N. W., 540; State v. Miller, 68 Conn., 378; 36 Atl., 795; St. Johnsbury v. Thompson, 59 Vt., 300, 59 Am. Rep., 699, 9 Atl., 571; Bibb v. State, 84 Ala., 13, 4 So., 275.

Upon the whole my opinion is that the accepted facts of this case do not bring either defendant, owner or agent within the operation of the injunction features of said statute. In so saying I am not unmindful of the decisions of our Court of Criminal Appeals in Willis v. State, 34 Texas Cr. App., 148, 29 S. W., 787, and Stratton v. State, 44 S. W., 506, both by Henderson, J. Certain expressions therein may reasonably be thought to indicate the view of that court to be that an allegation of "keeping" a house of the inhibited class is supported by proof

of "knowingly permitting" it to be kept; but that, I take it, is not their real meaning. Examination, by this writer, of the records in those cases discloses the fact that, in each instance, it was alleged, in one count, that the defendant "unlawfully kept, *was concerned in keeping* and *knowingly permitted* to be kept, the said house," etc. As I understand those cases, the decision in the former one was, merely, (a) that the indictment was valid, although the several phases of the offense, which were set out in the same statute, with a common penalty, were charged in one count; and (b) that the evidence was sufficient to support conviction for "knowingly permitting," etc., and the decision in the latter case was, "the house being appellant's, if he knowingly permitted the inmates to ply their vocation in his house, he would be guilty of the statutory offense," meaning "knowingly permitting," etc. I do not think either of those decisions conflicts with my views herein. See, also: Schulze v. State, 56 S. W., 918, by the same court.

In view of the phraseology of the question propounded, restricting it to the said Act of 1907, and of the present status of the case, and the facts being as stated, and the tenant not being a party, I do not deem it necessary or proper to express my opinion upon, or to discuss, the subject of the general equitable powers of the trial court, under the common law and aside from said injunction statute. I regret that this court has not had the benefit of any brief in behalf of the State.

Solely in the hope of thereby more clearly developing my views as to the legal effect of said statute, and with the utmost respect for my associates, I will refer to certain portions of their opinion herein.

With regard to the agent, Blackmon, said opinion, apparently, rests upon the hypothesis that under the facts of this case he was guilty of "keeping" a disorderly house; whereas, to my mind, it seems perfectly clear that the established facts, as summed up in said certificate, being merely such as would support the finding that Blackmon had "knowingly permitted" the illegal use of the house, would not at all sustain a conviction under an indictment charging "keeping" but not charging "knowingly permitting," etc.

Said majority opinion declares:

"The Court of Criminal Appeals has held that knowingly permitting the keeping of such a house is simply a method of committing the offense of 'keeping,' and is not in itself a distinct offense. Willis v. State, 34 Texas Cr. Rep., 148, 29 S. W., 787; Schulze v. State, 56 S. W., 918."

Plainly the intimation is that in the case at bar this court should follow the interpretation which our Court of Criminal Appeals, the court of last resort in criminal cases, has placed upon said statute, in criminal cases. Conceding that proposition, at least for the sake of argument, I am convinced that my views, as stated herein, rather than the decision and opinion of my associates, are in harmony with the cited cases from that court. The foregoing excerpt does not present what I consider a correct reflex of either of those cases. Before I saw the

opinion of the majority herein I had written down my views as to the effect of the Willis case, in the light of the indictment and evidence, and the issues therein as shown by the original record in that case.

In Schulze v. State, the indictment charged that the defendant "did then and there unlawfully keep, was concerned in keeping, and knowingly permitted to be kept, the said house," etc. The opinion, by Brooks, J., said: "Appellant's main insistence is that the indictment is defective. . . . The indictment is sufficient. White's Ann. Pen. Code, par. 566. The indictment is not duplicitous nor ambiguous, as 'contended by appellant, since the same follows the statute, and is certain to every legal and reasonable intendent. Duplicity consists in alleging in one count separate and distinct felonies. The rule never applies to allegations of different phases of the same misdemeanor. It is proper and right, in charging a misdemeanor, to charge the different phases that would go to constitute the misdemeanor in the same count in the indictment," citing cases. The court was not there discussing any question relating to the sufficiency of evidence to support either phase of the charge as set forth therein; and in the opinion I find nothing to suggest that one phase of the offense could be supported by proof of the commission of the other phase of the offense. On the contrary, that opinion expressly recognizes the fact that the misdemeanor embraces "different phases," and, consequently, distinct phases of the offense. Necessarily, each phase calls for different proof, and both of those cases, at least impliedly, yet distinctly, recognize that fact. Consequently, both are strong authority against the proposition in support of which they were so cited.

Said majority opinion herein then continues:

"Under this ruling, the evidence in relation to Blackmon would have made him subject to criminal prosecution for keeping a disorderly house by knowingly permitting it to be kept for that purpose."

The conclusion therein stated may be sound enough if applied solely to an issue relating merely to the form of an indictment, information or complaint under said statute; but if said conclusion is to be applied, as its context indicates it was intended, and as I think it must be applied here, to the actual issue as to whether the ascertained facts in the case at bar would support a conviction of the agent for "keeping" a disorderly house, and, therefore, will support an *injunction* against him, then I regard said conclusion as radically erroneous. Surely the statute does not mean, and certainly the Court of Criminal Appeals did not intend to hold or intimate, in any case, that proof of "knowingly permitting," etc., will support a conviction under an indictment for merely "keeping," etc.

That the fundamental idea upon which the majority opinion, in relation to the agent, proceeds as I have stated it, is made manifest by the following excerpt:

"From the nature of the Act of 1907, which comprises the articles we have quoted, it inevitably follows that any one subject to prosecution

for keeping a bawdy house, under the Penal Code, is subject to an injunction, under article 4689, for the purpose of restraining such unlawful use of premises. It is hardly logical to conclude that this statute, enacted in aid of the criminal law, is narrower in its operation than the criminal statute, and is without application to one amenable to the criminal law on the same subject."

Insofar as the case here against said agent is concerned, the logic of my associates, as I understand it, seems to be: (a) The injunction features of the statute were designed to include all criminal offenses denounced by it; (b) "keeping," etc., is one such offense; (c) a charge of "keeping" is supported by proof of "knowingly permitting"; (d) the evidence supports the finding that the agent "knowingly permitted" the house to be "kept" for the inhibited purpose; (e) therefore, the agent was guilty of "keeping," etc.; (f) consequently, the decree enjoining him from "using" said house for such inhibited purpose is authorized and supported by the facts.

But the proposition set out in (a) is demonstrably erroneous, and the proposition set out in (c) is plainly erroneous; wherefore the chain of logic is broken, and will not support the conclusion stated in (f). The fundamental error lies in the idea that, for injunction purposes, "keeping" and "knowingly permitting" are convertible and practically synonymous terms.

As to Mrs. Moore, the innocent owner, the effect of the majority opinion is that, although she has committed no offense against the criminal provisions of the statute, she should be enjoined from doing that which she never did nor thought of doing, so far as the certificate or facts show. Said opinion says: "She was a proper party to the proceeding, and the issuance of an injunction running against her, as well, was therefore not unauthorized." Referring to said statute, the opinion also says: "It can not be supposed that its intention was to deny the right to make or join as a party defendant in a suit one who, otherwise, would be a proper party." Who may and who may not properly be joined as defendants in this purely statutory action must be ascertained from within the four corners of this statute itself; and especially is that to be emphasized in view of the fact that, its terms and provisions aside, there can not, perhaps, be found a single precedent in any reported English or American case, which might be taken as a guide in determining who are proper parties defendant in an action of this character. And, as I understand said opinion, the conclusion of my associates that the owner is a proper defendant is based upon this statute alone. However, the reasons set out in support of that conclusion are, to my mind, without that cogency which usually marks their opinions. Really their argument in support of the injunction against the owner seems labored. The best that I can get out of it is the declaration: "The object of the statute would be defeated if the elements necessary to constitute the criminal offense must exist in order for it to apply. Its purpose was a broad one, and it should be given a

construction which is consonant with that purpose"; but that, I think, practically assumes the whole case. Very broad indeed are the criminal provisions, and also the provisions relieving the citizen plaintiff of the ancient necessity of showing injury special to himself; but to my mind the other injunction provisions seem much narrower, and appear to have been worked out with deliberate and thoughtful care, and in very guarded and restrictive terms, so that there is, at least, a very serious question as to whether the injunction portions of the statute were intended to embrace such innocent owner, or even an agent who "knowingly permits" the evil. Ordinarily, and as far as its phraseology will reasonably permit, a statute should be so construed as to conserve the definitely certain purpose for which it was enacted; but, in my judgment, that canon of statutory construction has no proper application where, as in this case, the extent of the legislative policy is uncertain, and the rigor of the phraseology employed in the Act ties down its wings.

Said opinion finds justification for holding the owner, under the circumstances of this case, subject to injunction, in the fact that she is under the common law duty of keeping her premises from becoming a public nuisance. I think that argument might have more force if addressed to the Legislature. The question here is, not what ought to have been done, but what was done, by the Legislature.

The analogy which said opinion finds in the civil liability of the owner of property for damages resulting from the maintenance of a nuisance on his premises, even though without his knowledge, does not seem applicable in construing this statute, because, consistently, such civil law liability may be admitted and the liability of such owner to an injunction under this statute denied. One certainly does not follow or depend upon the other, and, so far as I can see, it furnishes no reliable guide to a decision as to the legal effect of this statute.

The said opinion also says:

"The question here is merely as to the right to have an injunction run against an owner for the abatement of a public nuisance. In such case it is difficult to perceive how the right is affected by the owner's previous want of knowledge that the premises constitute such a nuisance."

To that it may be answered that the right to this injunction, even according to the majority view of this case, rests solely and alone upon the statute, and the statute does not so far extend the right of injunction. Moreover, the statute does not, in terms, define or denounce any "nuisance," nor provide for abatement thereof. Said Iowa statutes did both. In addition to its criminal features, our statute of 1907 merely authorizes actions for "injunction," and it does even that in a very restricted fashion.

The reasoning in the majority opinion to the effect that, inasmuch as the law protects the owner in the use of the property, it devolves upon her to see that laws applicable thereto are enforced, and that, therefore, and always, the owner is subject to the injunction, seems to me to in-

volve a *non sequitur.* If that reasoning be sound, what need was there for any statutory provisions authorizing injunction against an owner or agent? The duty of the owner to the public, or the State, is a proper matter for the Legislature to consider, but I can not see how considerations by the court of individual obligation can throw light upon the legal meaning of this statute, as it stands, unless it be upon the assumption that in framing this law the Legislature undertook to go to the limit of its power in the premises; and if that premise be conceded the argument ends and the decree was proper.

Said opinion declares:

"The right to an injunction rests upon proof of the nuisance, regardless of his knowledge or want of knowledge that his premises are being unlawfully used. It is not affected by the question of the owner's knowledge; and of course it is not defeated by his want of knowledge."

What is the function and effect of this temporary decree against the owner, and what will be its ultimate potential effect, if it be made perpetual, as it probably will be? It is difficult to answer that question, and that very difficulty illustrates the great length to which the trial court and my associates have gone in construing and applying said statute. If said injunction be perpetuated, and if, despite the exercise by this owner of good faith and diligence to comply with said injunction and said statute in future, she shall have the misfortune hereafter to lease said premises 'to some other tenant who shall offend against said statute as did the former tenant, will said owner thereby become subject to punishment as for contempt for violating said injunction which was granted under precisely similar circumstances? If not, why not? Doubless to so punish her then would be unprecedented, but so is now the decree against her. As to such future offenses by such future tenant, this owner's status will then be precisely the same, as a matter of law, as it was with regard to the like offense of the former tenant at the institution of this suit.

By the decree the defendants are "enjoined from using the house . . . for the purpose of keeping, or being interested in the keeping of a bawdy or disorderly house therein." Now, if it is then to be held that such assumed facts, as then so existing, will not constitute, upon the part of the owner, such "use" of the house, for either the "purpose of keeping" or for the purpose of "being interested in the keeping" of such house as a bawdy house, or as a disorderly house, or both, as to subject the owner to such punishment, how can it be held that precisely similar facts now bring such owner within the terms of the injunction provisions of this statute, thereby authorizing said temporary decree against her? On the other hand, would not declination of the trial court to then so punish her practically nullify the injunction against her and render it farcical, at least as to all such future violations of the statute by future tenants without knowledge or notice upon the owner's part? If it be said that the legal effect of the injunction against the owner does not include such future violations of the law without knowl-

edge or notice upon the part of the owner, or that, under time honored practice, punishment for contempt could not be meted out to the owner in the absence of an intent upon her part to violate the injunction, it may be answered that it was granted upon just such facts, that it expresses no such limitation or restriction, and that the very broad language of said majority opinion furnishes grounds for doubt as to whether, in future, such perpetual decree would be regarded and treated as so restricted or not. If the right of the State, or of the citizen, to have an injunction against an owner having at the institution of the suit neither knowledge nor notice of the illegal use of the premises "is not affected by the question of the owner's knowledge and of course it is not defeated by his want of knowledge," as my associates hold, and if, as a necessary corollary, the District Court is authorized to enter such decree against this owner, under the facts, who shall say, and upon what reasoning shall it be held, that the enforcement of such decree will not, likewise, be entirely unaffected by want of knowledge or notice upon the owner's part, of future offenses by some other tenant?

In reading various portions of said majority opinion it is difficult to shake off the impression that it is a discussion of the general equity powers of the District Court, and to call the mind back to a realization of the fact that it is a discussion of the legal effect of the statute.

I am not at all sure that, in some respects, and particularly in so far as the owner is concerned, this statute does not somewhat restrict powers theretofore possibly vested in, although, it seems, never yet exercised by, the chancellor, under the common law.

Martin v. Blattner, 68 Iowa, 286, 25 N. W., 131, 27 N. W., 244, upon which the majority opinion strongly relies, arose under chapter 6 of title XI of the Iowa Code, regulating the manufacture and sale of intoxicating liquors, as amended by chapter 143 of the Laws of the Twentieth General Assembly. Said amended statute provided, among other things:

"Sec. 1543. In cases of violation of the provisions of either of the three preceding sections or of section fifteen hundred and twenty-five of this chapter, *the building or erection of whatever kind, or the ground itself in or upon which such unlawful manufacture or sale,* or keeping with intent to sell, use or give away, *of any intoxicating liquor is carried on,* or continued, or exists, *and the furniture, fixtures, vessels, and contents is hereby declared a nuisance and shall be abated as hereinafter provided,* and whoever shall erect or establish, or continue, or use any building, erection or place for any of the purposes prohibited in said sections shall be deemed guilty of a nuisance, and may be prosecuted and punished accordingly, and upon conviction shall pay a fine of not exceeding one thousand dollars and costs of prosecution, and stand committed until the fine and costs are paid; and the provisions of chapter 47, title 25 of this code, shall not be applicable to persons committed under this section. *Any citizen of the county where such nui-*

*sance exists,* or is kept or maintained, *may maintain an action in equity to abate and perpetually enjoin the same,"* etc.   (Italics mine.)

It will be observed that the injunction features of the Iowa statute are essentially different from those of the Texas statute, in these particulars:

(1)   The Iowa statute employs language which is very broad; the Texas statute uses language which is quite restrictive.

(2)   The Iowa statute expressly declares the ground, buildings, etc., a nuisance and provides that it may be abated, whereas the Texas statute has no such provision, but, on the contrary, evidently attempts to authorize an injunction against only certain enumerated phases of the criminal offense, following, as far as the injunction provisions go, particular phases of the offense as specifically set out in the criminal provisions of the Act.

(3)   The Iowa statute contains no statement relative to, or designation of, parties defendant in an action for abatement or injunction; the Texas statute expressly enumerates what classes of persons may be made parties defendant.

That suit was brought under section 1543, by a citizen, against a tenant and another, and against the owner of the building, to restrain the maintenance of a nuisance by keeping therein a place for the unlawful sale of intoxicating liquors.

Upon the original hearing it was held that the owner of the premises, who did not have any knowledge, at the time the injunction was asked, that his tenant had committed a statutory nuisance thereon by selling intoxicating liquors contrary to law, obtained knowledge at the trial that his building was, for that reason, under the statute, a public nuisance; and by failing to cancel the lease and oust the tenant the owner became "an aider and abetter of the violator of the law," and was "a proper party to the action, and the court rightfully restrained him from permitting the unlawful traffic."

I can not understand by what process of reasoning the court reached the conclusion that, by virtue of the facts stated, consisting of mere knowledge of the illegal use of the premises, and failure to cancel the lease and oust the tenant, the owner became an "aider" or "abetter," practically *particeps criminis,* in violating the Penal Code.   To my mind that reasoning appears illogical.   But, even if that conclusion can be justified by that statute, as a whole, and even if that conclusion supports the decision of the Iowa case, it seems clear that under the phraseology of our statute relating to bawdy houses and disorderly houses, "knowingly permitting," and "aiding and abetting" are two entirely distinct and different phases of the offense therein denounced, and that, therefore, an indictment charging an owner with "aiding and abetting" in the commission of the offense could not be supported by proof of merely "knowingly permitting" it; and, consequently, the very ground of the Iowa decision failing, under our statute, that decision itself is of but little, if any, value in the case at bar.

However, it is manifest, I think, that the enumerated facts did not

constitute the owner one who "aided" or "abetted" in the commission of any criminal offense which is denounced by that statute.  If the reasoning of that court on that point is sound, the owner, upon that evidence alone, could have been convicted in a criminal prosecution for "aiding and abetting" in committing the criminal offense, although the evidence disclosed an utter absence, on his part, of any active participation in, and of any intent to do, the thing which the statute denounces as such criminal offense.  Such reasons given by that court for its decisions being obviously unsound, they ought not to control the construction of our law, even were it a copy of the Iowa statute.  That, of course, does not mean that the decision can not be justified upon other grounds, as, for instance, that the injunction features of the statute are couched in very broad and comprehensive language and no designation or enumeration of parties defendant is made, and therefore it may be assumed that the Legislature intended that the owner might be made a party defendant to such suit, and that the statute should be construed as so providing, *by implication.*

In my view of the Iowa decision it seems to have been controlled, finally, by the peculiar phraseology of that statute, a feature which is developed more clearly in the opinion on rehearing, wherein, with reference to the owner, the other member of that court who was then speaking for it, said:

"When Mr. Gibbs was made a party to the action, he obtained knowledge that it was claimed and charged that his tenants had been using the leased premises as a place for the sale of intoxicating liquors, thereby creating a public nuisance, and therefore he, as the owner of the premises, or, rather, *his property,* under the statute, would become liable as therein provided. . . ."  (Italics mine.)

Then follows a quotation from section 1543, *supra,* after which the court said:

"Under this statute it seems to us that the building becomes a nuisance, and that its continuing as such may be enjoined and prevented."

In dealing with the owner's contention that he could not be reached by injunction, the court said:

"We think the consideration of some familiar principles of the law and *provisions of the statute* will establish the contrary conclusion." (Italics mine.)

In effect the action was there treated as being *against the property.* Our statute does not provide for or contemplate an action of that nature, and under our statute I can find no room for the application of such general principles of equity.

In O'Sullivan v. Railway Co., 7 N. Y. Supp., p. 51, upon which, also, my associates rely, the action was to enjoin a nuisance in the form of a railroad along a street in front of plaintiff's land, to prevent continuance of a trespass.  The corporation which originally trespassed had leased its line to another, which was operating said line.  Held:  Both were necessary parties.  That court said:  "In order to enable the court

effectually to give this perpetual relief it was necessary that all parties having a substantial interest in the title to the structure and its use should be made parties. . . . Thus it was proper and necessary that the lessor as well as the lessee should be made parties, so that the person entitled to possession of the structure, in case of the termination of the lease for any cause, should be affected by the judgment of the court, perpetually restraining the continuance of the trespass."

Unquestionably that decision was intended to rest, and does rest, upon general principles of equity, and I am unable to see how it can aid in determining what interpretation should be given to the peculiar language of our statute.

I believe that the certified question should be answered negatively.