Fred Burnett, Plaintiff in Error, v. John W. Rudd and City of Knoxville, Defendants in Error.*

(*Knoxville*, September Term, 1932.)

Opinion filed November 26, 1932.

---

*As to municipal liability for negligence of fireman, see annotation in 1 L. R. A. (N. S.), 666; 4 L. R. A. (N. S.), 629; 44 L. R. A. (N. S.), 68; 9 A. L. R., 143; A. L. R., 688; 19 R. C. L., 1117; R. C. L. Perm. Supp., p. 4762; R. C. L., Pocket Part, title "Municipal Corporations," section 398.

As to liability of municipal corporation for nuisance, see annotation in 75 A. L. R., 1196; 20 R. C. L., 397, 398 R. C. L., Perm. Supp., p. 4896; R. C. L. Pocket Part, title "Municipal Corporations," section 20.

JENNINGS & WRIGHT, for plaintiff in error.

W. H. PETERS, JR., and D. J. KELLY, for defendants in error.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

240

Fred Burnett sued John W. Rudd and the City of Knoxville for damages resulting from a collision between the automobile which he was driving and a fire truck owned by the city and operated by Rudd at the time of the accident. The collision occurred at the corner of Magnolia Avenue and Gay Street. Burnett was driving west on Magnolia Avenue, and stopped on the east side thereof until the green signal light was turned on, when he proceeded west across Gay Street, but before clearing same he was struck by said truck, which was being driven north on Gay Street.

The trial court sustained the demurrer of the city and dismissed the suit as to it, primarily upon the rule that absolves a municipality from liability where it is engaged in the discharge of a governmental duty. Thereupon plaintiff entered a nonsuit as to Rudd, and prayed and was granted an appeal as to the city. The case has been very ably briefed and argued by counsel, and is a case that has been seriously and carefully considered by the court. The declaration covers twenty-eight typewritten pages, so that it is impracticable to include it in its entirety in this opinion. The first count of the declaration, after detailing the facts of the accident, avers the following acts on the part of the city, which plaintiff avers constitute an actionable nuisance, to-wit:

I. "On said 2nd day of January, 1931, the date of plaintiff's injuries, it was the custom and for a long period of time had been the persistent habit and custom of those driving the motorized fire truck of the defendant, City of Knoxville, to fires, to drive the same at a high and dangerous and grossly negligent rate of speed through the narrow and congested streets of said City at a rate of speed from fifty to sixty miles per hour, and that this custom was generally and well known to the

inhabitants of said City and was so patently and obviously dangerous to the citizens and residents of said City using the streets thereof as to be a menace to the life and limb of the public and to constitute a nuisance, and that said habitually negligent and wanton operation of said motorized fire fighting apparatus of said defendant, City of Knoxville, through and over the streets of said City was known, or by the exercise of reasonable diligence and ordinary care, could have been known to the Administrative and Legislative officers of the said City of Knoxville, and that said custom and said nuisance thus tolerated and maintained by defendant, City of Knoxville, was and is contrary to the laws of reason and to the rights of people lawfully using the streets of said City, and was dangerous to their life and safety, but that notwithstanding such fact, the defendant, City of Knoxville, its officers and agents, for a long time prior to the injury sustained by plaintiff, negligently failed to prevent the driving of the motorized fire fighting equipment of the City of Knoxville over the streets of said City at the aforesaid dangerous, negligent, unlawful and wanton rate of speed.''

2. ''That on and prior to said 2nd day of January, 1931, defendant, City of Knoxville, had installed at the intersection of the streets within the congested or business district of said City, traffic control signals, consisting of electric lights, for the purpose of controlling the movement of traffic; that such signal lights had been installed at the intersection of Magnolia Avenue with Gay Street, that traffic facing the green signal might proceed, that traffic facing the red signal light was under obligation to stop before entering the intersection and to remain standing until the green or 'go' signal was shown, and that on said 2nd day of January, 1931,

242

and for a long time prior thereto, it was the custom and usage of the employes of said City of Knoxville operating said 'stop' and 'go' signals when the fire fighting apparatus of the City of Knoxville was using and traveling over a street whereon said 'stop' and 'go' signals had been installed to throw on and hold on the red or 'stop' signals along the route being traveled by said fire fighting apparatus of the City of Knoxville, and also on and at all street intersections, so as to stop all traffic on, along or across said street, and also to sound a siren at the intersection of other streets with the street being traveled by said fire fighting apparatus of defendant, City of Knoxville.''

3. ''Plaintiff avers that on said 2nd day of January, 1931, he was riding in his Paige Sedan automobile, accompanied by his wife, who was seated on the front seat with him, holding their two-year-old son in her lap, and by his sister-in-law, Gladys Hubbs, who was seated on the rear seat of plaintiff's automobile, and that plaintiff was driving his said automobile west on Magnolia Avenue toward the intersection thereof with Gay Street; that when he reached the intersection of Magnolia Avenue with Gay Street, the traffic light on the opposite side of Gay Street, which was plaintiff's signal to go or stop, was red, and plaintiff stopped his car and waited until the traffic light on the opposite or west side of Gay Street turned green, whereupon plaintiff started to drive his automobile west on Magnolia Avenue through the intersection thereof with Gay Street; that as plaintiff thus started to drive through the intersection of Gay Street no siren was sounded on the traffic signal post, as it was the custom to sound the siren when Gay Street was being used by the fire fighting apparatus of the City of Knoxville; that a street car was standing on the

north bound or east track on Gay Street, just south of the intersection of Magnolia Avenue with Gay Street; that plaintiff proceeded to drive his car across said intersection, and when he, in the exercise of due care, had reached a point in said intersection midway between the north and south bound railway tracks on Gay Street, he looked to the left and saw the motorized fire truck of the defendant, City of Knoxville, dash out at a high, dangerous, negligent, reckless, unlawful, rapid and wanton rate of speed, from behind and to the left of said standing street car; that plaintiff, thus placed in a position of sudden peril, did all in his power to reach a place of safety and avoid the impending danger, but despite his efforts, the said motorized fire truck of the defendant, City of Knoxville, was run into and against plaintiff's automobile, striking it was such tremendous force and violence as that it was turned around and thrown with great force and violence against the signal post standing on the northwest corner of the intersection of Magnolia Avenue with Gay Street, thereby completely demolishing and destroying plaintiff's car, fatally injuring his sister-in-law, and severely injuring plaintiff.''

The second count is predicated upon the violation of the state statutes prohibiting the driving of automobiles in excess of thirty miles per hour.

The third count is based upon the violation of the traffic ordinances of the city in force at the time of the accident.

The remaining six counts are predicated upon the same grounds as those enumerated in the first three counts.

Counsel for plaintiff concede that under the general rule a municipality in performing governmental duties is exempt from liability for torts, and that the oper-

ating of a fire department by a municipality is a governmental function.

In *Irvine* v. *Chattanooga*, 101 Tenn., 291, the decision of the court is fairly stated in the syllabus, which is as follows:

"The duty of a municipal corporation to extinguish fires is a public and not a corporate one, and an action will not lie against it for the negligence of the fire department in responding to a call for its services, and the rule is not changed by the fact that the expenses of the fire department are estimated each year in fixing the tax rate."

In *Foster* v. *Water Company*, 71 Tenn., 42, 48-49, it was said: "The inclination of the courts has been not to press the pecuniary liability of municipal corporations, which is distinctly recognized where the duty is a corporate one, absolute and perfect, and owing to an injured party, to cases where a duty is assumed not for the corporate benefit, but the common good. They have refused to hold a city liable for the acts of its police officers although they are appointed by it; or for the acts or negligence of its agents and employes in charge of patients in a public hospital; for the misconduct of the members of its fire department; or for the city's own neglect to provide suitable engines or fire apparatus, or to keep in repair public cisterns, or continue the supply of water to particular hydrants. Dill. Mun. Cor., sections 723, 774, 775; *Tainter* v. *Worcester*, 132 Mass., 311; *Lansing* v. *Toolan*, 37 Mich., 152; *Wheeler* v. *Cincinnati*, 19 Ohio, 19. The reason is, that the hazard of pecuniary loss might prevent the corporation from assuming duties, which, although not strictly corporate nor essential to the corporate existence, largely subserves the public interest. The supplying water for the extinguishment of

fires is precisely one of those acts which bring no profit to the corporation, but are eminently humanitarian. To hold a city responsible for the loss of a building, or of whole streets of houses, as sometimes happens, because it might be thought, or because in reality some of its indispensable agents had been negligent of their duty, might well frighten our municipal corporations from assuming the startling risk.''

The reason for exempting the municipality from liability for torts when performing a governmental duty is thus stated by McQuillin on Municipal Corporations, section 2793:

''The doctrine exempting a municipal corporation from private action for torts resulting from the performance of its governmental functions, steadily adhered to by the most recent decisions, as above indicated, is based on the familiar reason that the undertaking is not to promote the private interests of the municipality as a corporate entity, but rather for the public benefit, and in the performance of such obligation the municipality is a mere public agent, either of the state or of the local community. The reason, as often expressed, is one of public policy, to protect public funds and public property. 'Taxes are raised for certain specific governmental purposes; and, if they could be diverted to the payment of the damage claims, the more important work of government, which every municipality must perform regardless of its other relations, would be seriously impaired if not totally destroyed. The reason for the exemption is sound and unobjectionable.' ''

And in *Irvine* v. *Chattanooga, supra,* the court quoted approvingly from Dillon on Municipal Corporations as follows:

"The exemption from liability in these and the like cases is . . . that the service is one in which the corporation, as such, had no particular interest, and from which it derives no special benefit in its corporate capacity; that the members of the fire department, although appointed and paid by the city corporation, are not the agents and servants of the city, for whose conduct it is liable, but they act rather as officers of the city charged with a public service, for whose negligence in the discharge of official duty no action lies against the city without being expressly given. The maxim of *respondeat superior* has, therefore, no application."

█ Counsel for the plaintiff insist, however, that the facts of this case bring it within the rule that holds the municipality liable, even when engaged in the performance of a governmental function, if by its acts a nuisance is created. There have been numerous decisions of this court holding a municipality liable in such circumstances, a few of which, by way of illustration, will be referred to.

In *Chattanooga* v. *Dowling*, 101 Tenn., 342, the city constructed a sewer through which much loathsome sewerage was deposited upon defendant's land, greatly depreciating its rental value, as well as the value of the soil upon it.

In *Kolb* v. *Knoxville*, 111 Tenn., 314, the city maintained six or seven drains having manholes with perforated tops into which garbage was dumped, and from which noisome vapors were emitted and carried by the air into the house of the plaintiff, injuring valuable property, and making the life of himself and family uncomfortable.

In *City of Nashville* v. *Mason*, 137 Tenn., 169, a garbage dump, upon which large quantities of material were

burned during a high wind, from which fire was communicated to plaintiff's house and destroyed it.

In *Williams* v. *City of Nashville*, 145 Tenn., 677, the city placed a pile of dirt in the street and permitted it to remain there after dark unguarded, unlighted, and unprotected, resulting in injury to the plaintiff.

In each of these cases the city was held liable under the nuisance doctrine. It will also be observed that in each the city committed some affirmative act that constituted a nuisance, which is not true in the instant case. Counsel fail to distinguish between a condition produced by the affirmative action of the city and the negligent acts of its employes resulting in injury to a citizen. The city created no condition upon Gay Street that could be classed as a nuisance.

In 46 Corpus Juris, 603, it is said: ''While a lawful thing or act may be a nuisance by reason of its negligent use or operation, nuisance is a condition, and not an act or failure to act of the person responsible for the condition. As a general rule, negligence is not involved in nuisance actions or proceedings, and is not essential to the cause of action.''

The declaration avers that the fire department habitually ran this truck at a rate of speed from fifty to sixty miles per hour and in a gross, negligent and wanton manner, and that this custom was known, or by the exercise of reasonable diligence and ordinary care, could have been known to the administrative and legislative officers of the city. The allegation that this truck was operated wantonly is a mere conclusion of the pleader, since no facts are stated in the declaration to support such a charge. The declaration does allege acts of negligence on the part of the operators of the truck and signal system, but for such acts the city is not liable; and,

248

as stated in the above text, "As a general rule, negligence is not involved in nuisance actions."

 In its final analysis, the case is this: Does the mere fact that the city permits its fire truck to be operated through Gay Street at a rate of from fifty to sixty miles per hour constitute a nuisance?

With respect to the precautions which the city has taken to prevent accidents, we quote from the declaration as follows: "And plaintiff avers that on said 2nd day of January, 1931, and for a long time prior thereto, it was the custom and usage of the employes of said City of Knoxville operating said 'go' and 'stop' signals, when the fire fighting apparatus of the City of Knoxville was using and traveling over a street whereon said 'stop' and 'go' signals had been installed, to throw on and hold on the red 'stop' signals along the route being traveled by said fire fighting apparatus of the City of Knoxville, and also on and at all street intersections so as to stop all traffic on, along or across said street, and also to sound a siren at the intersection of other streets with the street being traveled by said fire fighting apparatus of the defendant, City of Knoxville. . . . As plaintiff thus started to drive through the intersection of Magnolia Avenue with Gay Street, no siren was sounding on the traffic signal post, as it was the custom to sound a siren when Gay Street was being used by fire fighting apparatus of the City of Knoxville."

The declaration avers that the accident occurred in the congested business center of the city, and it is inferable from the declaration that the truck was responding to a fire alarm.

It is essential that in such circumstances a speedy response be made to prevent a conflagration, particularly

in the business area of a city. Upon this question we quote from 42 Corpus Juris, 1026-1027, as follows:

"Apart from any express grant of privileges in these respects, it is usually considered that, by reason of the necessities of the situation and the public interest, and in the absence of a clear expression of legislative intent to the contrary, fire apparatus and other vehicles of a municipal fire department, whose function is the saving of life and property, are, when in use for such purpose, exempt from traffic regulations, such as those fixing speed limits and prescribing the mode of turning at intersections. It has been considered that such vehicles are entitled to the right of way at crossings and intersections, but other authorities hold that there is no common-law right of way of fire vehicles over other vehicles.

"Traffic regulations frequently provide in express terms that fire department vehicles shall be exempt from speed limits, shall be entitled to the right of way, or shall be accorded a clear passage by other vehicles drawing to the curb and stopping on their approach. The extent of such special privileges is necessarily determined according to the terms of the grant. If the grant is a general one, unrestricted in terms, such vehicles are entitled to assert their privileges at all times when in use for proper purposes, but when the grant is limited in terms, it must be construed accordingly. Thus an exemption of such vehicles when going to a fire or answering an emergency call is applicable only under such circumstances, and not when such a vehicle is using the streets for any other purposes. Every fire call is, however, regarded as an emergency within such an exemption. It is, of course, the duty of the operator of the other vehicles to recognize the superior rights of fire apparatus and govern their conduct accordingly."

In 9 A. L. R., 143, the annotator says:

"The overwhelming weight of authority is to the effect that a fire department, maintained by a municipal corporation, belongs to the public or governmental branch of the municipality so as to relieve it, at least in the absence of statutory provision to the contrary, from liability for injuries to person or property resulting from malfeasance or nonfeasance connected with the maintenance and operation thereof."

In support of the rule announced the annotator cites decisions from thirty-one states, and from the District of Columbia. Since then the Ohio Supreme Court has adopted the majority rule in *Aldrich* v. *Youngstown*, 27 A. L. R., 1497. This rule was also recognized by the Supreme Court of the United States in *Workman* v. *New York*, 179 U. S., 552, 45 L. Ed., 314.

The only case we have been referred to taking a contrary view is *Maxwell* v. *Miama* (Fla.), 33 A. L. R., 682, and the holding in that case is to the effect that a city operating a fire department is not engaged in the performance of a governmental function to the extent that it is exempt from liability. This, of course, is contrary to the decision of this court in *Irvine* v. *Chattanooga, supra,* and *Foster* v. *Water Company, supra.*

We have found no question upon which the decisions are in more general accord; and we have been referred to no statute in this or in any other state where a legislature has assumed the responsibility of rendering a municipality liable in such circumstances as this case presents.

The accident in this case was a most serious and unfortunate one. On the other hand, it would work disaster to the public if the doors of the municipal treasuries were thrown open to every one who conceives that

he has been injured by some employe of a city while performing a governmental duty. If public policy demands that this be done, the appeal should be made to the legislature and not to the court. As was said by the Iowa Supreme Court in *Bradley* v. *Oskaloose,* 193 Iowa, 1072: "Sovereignty and its incidental powers still have a deep significance in our system of jurisprudence, and if the rule of nonliability is to be hurled into the rag-bag of the past, it must be done through legislative enactment."

Affirmed.