STATE *v.* JAMES *et al.*

(*Nashville,* December Term, 1940.)

Opinion filed December 21, 1940.

HARRY G. NICHOL, Assistant Attorney-General of Nashville, for the State.

A. P. OTTARSON, JR., J. N. DANIEL, JOE BROWN CUMMINGS, and ALBERT WILLIAMS, all of Nashville, for defendants James.

Mr. Justice McKinney delivered the opinion of the Court.

The petition herein was filed under the authority of section 9324 of the Code, which provides that "the conducting, maintaining, or engaging in the sale of intoxicating liquors; the keeping, maintaining, or conducting bawdy or assignation houses; . . . . are hereby declared to be public nuisances, and may be abated under the provisions of this chapter."

The trial court found all four of the defendants guilty and decreed that they be permanently enjoined from engaging in the illegal storage and sale of liquor, and from conducting and maintaining a bawdyhouse on the premises fully described in the decree. Bill James and Grace James alone appealed. The Court of Appeals affirmed the decree of the trial court, and the case is in this court upon the petition of Bill James and Grace James for a writ of *certiorari,* by which they ask this court to review and reverse the decrees of the other courts.

All of the defendants are negroes. The principal actor in the drama is Bill James, who is thirty-five years of age and the husband of Grace James. It appears from the record that these parties moved to Nashville in 1933, but the record does not disclose where they came from. Upon their arrival, Bill James became engaged in the "Numbers Game," and at some subsequent date was convicted of that offense and served a term of imprisonment therefor. How long he carried on that business, the date of his conviction, and the punishment imposed does not appear in the transcript. Evidently from that business, or from some other source, James accumulated quite a nice estate. In 1937 he built a two-story hotel

at 1122-1124 Cedar Street containing a restaurant and six bedrooms on the ground floor and twelve bedrooms on the second floor. These parties also own two story buildings and a theater building in the neighborhood of this hotel. Title to all of this property was taken in the name of the wife, Grace James. Bill James is the manager of the hotel and the other two defendants were employees of that hostelry. James and his wife lived in an apartment about a half block from the hotel.

The record shows that one Roy Cooper became a roomer at this hotel on November 22, 1939, and from his room was engaged in bootlegging liquor until he was expelled by James. The record shows that for a month prior to Christmas, 1939, the Department of Finance and Taxation procured a number of persons to purchase liquor from Cooper and furnished twenty dollars or more for that purpose. James testified that so many people were going to Cooper's room that he became suspicious he was selling whisky, and discovered that he was about a week after he took up his residence at the hotel. Notwithstanding this knowledge, James made no attempt to have this evil suppressed until after the petition herein was filed on January 9, 1940. Thereafter James complained to the police of the city and had them to make a raid on Cooper's room on January 17, 1940; but, of course, they found no whisky but only a number of empty whisky bottles. This, quite likely, was a clever scheme on the part of this shrewd law violator to make it appear that he was assisting the officials in enforcing the law; that he admits that in some way, unknown to himself, Cooper was informed that the raid would be made, thereby enabling him to dispose of his liquors before the officers arrived.

On the night of January 7, 1940, officers, being advised that there was a white woman in this hotel, raided it, finding two white women in bed, or who had been in bed, with negro men; also five negro couples, who were not married, occupying beds together.  On this particular night it appears that the defendant, William Bradley, who was night clerk, left the hotel in charge of his codefendant, John Moore, and drove in an automobile to McGavock Street where he picked up two white girls and brought them to this hotel, being admitted by Moore through the back door, for the purpose of gratifying the lust of himself and another negro man.  It is also shown that there is a buzzer on the back door of this hotel so that entrance may be gained at that place.  James testified that the buzzer was installed for the benefit of chauffeurs who parked their automobiles in the rear.

Upon this testimony we think there is ample evidence to support the concurrent findings of the other courts.

It is urged, however, that the record establishes the use of this hotel for assignation purposes only one night. We think it can be reasonably inferred that if there were seven couples so engaged on that one night that like offenses had been committed on previous nights.

In *Lewinsohn* v. *United States,* 7 Cir., 278 F. 421, 425, petition denied by the Supreme Court in 258 U. S., 630, 42 S. Ct., 463, 66 L. Ed., 800, it is said:

"Counsel stresses the necessity of proving repeated sales in order to justify a finding of a common nuisance, citing *United States* v. *Cohen* (D. C.), 268 F., 420. But such a test is neither an accurate nor an exclusive one. The court might well conclude from evidence of a single sale that the room or the building was a common nuisance and that it was a place where liquor was 'being manufactured, sold, kept or bartered' in violation of the

statute. No doubt repeated sales of the same beverage on other occasions and under other circumstances might justify greater certainty in the trier's mind as to the use to which the building was being put. There could be, however, an almost irrefutable conclusion drawn from a single sale, provided the facts surrounding such sale warranted the inference that it was one of the ordinary and usual incidents of the business there conducted.''

■ Upon this question Mr. Cornelius, in his work on Search and Seizure (2 Ed.), p. 726, says:

''There is more apparent than real conflict in the cases. The logical test which ought to be applied in every case, is not the number of sales which the evidence establishes was made but whether the evidence taken as a whole indicates recurrent acts which amount to a nuisance, and time is not a material ingredient of the crime of keeping and maintaining a common nuisance contrary to the provisions of the prohibition law.''

There are other cases to the same effect. This rule of evidence applies likewise to the maintenance of bawdy and assignation houses. It is unreasonable to assume that, notwithstanding seven couples were engaged in such unlawful cohabitation on this particular night, such wrongs were not committed on other nights, especially in view of the fact that the clerk of this hotel went out on January 7th and secured two white girls for illicit purposes; and neither he nor Moore was produced by the proprietor to show that this was exceptional and that such practices had not been indulged in before that time.

■ It is also said that James and wife had no idea that their hotel was being used for such purposes, and that they are innocent victims of misplaced confidence in their agents, employees, and roomers. If this were true, guilty proprietors could always escape punishment by

absenting themselves from the place of a crime and pleading innocence when their representatives are detected in committing an offense. In such circumstances the law holds the principals bound for the misconduct of their agents and employees.

With respect to the traffic in liquor, James admits knowledge of its illegal sale within a week after Cooper became a roomer, which would be the latter part. of November. Notwithstanding this knowledge, he made no attempt to stop it until the middle of January, which was subsequent to the filing of the petition here.

With regard to the other feature of the case, we hold that James and wife are bound by the acts of their agents and servants.

Mr. Joyce, in his work on Law of Nuisances, p. 79, says: . "And it is decided that a master, or owner of works, carried on for his profit by his agents or servants, is liable to be indicted for a public nuisance caused by acts of his workmen in carrying on the works, though done by them without his knowledge and contrary to his general orders."

The author, on page 77, says: "If a nuisance is created by his acts it is immaterial how innocent the intent was for the element of motive or intent does not enter into the question of nuisance, otherwise the maxim *sic utere tuo ut alienum non laedas* would be unwarrantably limited."

Upon this question the Supreme Court of Minnesota, in *State ex rel. Robertson* v. *Wheeler,* 131 Minn., 308, 312, 155 N. W., 90, 92, which was a suit to abate the use of a building as a house of ill fame, made this statement: "Her son had charge of the rental of the property. Of course, she is bound by the knowledge of her agent. An owner cannot leave his property in the hands of an agent,

and avoid abatement proceedings by showing lack of personal knowledge. If his agent knows, he knows.''

While there is conflict in the authorities, the majority of cases take the view that knowledge by, or notice to, the owner of a hotel or building of its illegal use by the lessee as a gambling resort or an assignation house, is not necessary as a condition of the abatement by injunction of such public nuisance as against the owner. See *State ex rel. Bailes* v. *Guardian Realty Co.,* 237 Ala., 201, 186 So., 168; 170, 121 A. L. R. 634, and cases cited therein. Also cases collected in the annotation in 121 A. L. R. beginning at page 643.

In the opinion in the *Bailes Case* it is said:

''It must also be remembered that the statute imposes no penalty upon the owner, nor does it act retroactively, its whole purpose is prospective, having for its sole object and aim, the prevention, by injunction, of a continuation of the illegal use of the property. The owner's property is not padlocked, nor taken from him on account of the illegal use of it by his tenant, but he is enjoined from allowing a continuation of that use, that is, he is required to see to it that the property is not again diverted from lawful use and converted into a nuisance.

''At common law the owner of premises was under the duty, and upon him rested a primary obligation, to keep his premises from becoming a public nuisance. Joyce on Nuisances, section 453. The statute here invoked places no higher duty upon the owner than did the common law. It—the statute—supplies a remedy possibly more speedy and efficacious than did the common law to abate a nuisance which the owner had created, or suffered to be created.

''This duty and obligation on the part of the owner

spring from the maxim, 'So use your property as not to injure the rights of another.' "

The court then quotes at some length from an opinion by Chief Justice Phillips of the Supreme Court of Texas in *Moore et al.* v. *State of Texas*, 107 Tex., 490, 181 S. W., 438, 440, from which we copy the following excerpt:

"The owner's ignorance of the past unlawful use of his property does not relieve him of responsibility for its future use. He cannot say that because he was unaware that it had become a public nuisance, the nuisance may not be restrained and its further existence prevented by an injunction running directly against him, requiring the exercise of his authority as the owner of the property, primarily charged with the duty, inhering in his ownership, of seeing that it is not devoted to unlawful purposes. If in such cases the owner may relegate the proceeding to an action simply against those directly responsible for the nuisance and others concerned with them, it means that they alone are charged with that duty and he is exempt from it. But the law does not protect persons in the ownership of property, and then permit them to absolve themselves from all obligation in respect to the uses to which it is applied. Ownership carries its duties as well as its benefits. One of them is to keep the property from a use which is unlawful. It is imposed upon the owner because that is where it ought to rest. It is an element of his right of control over the property; his authority to direct the purposes for which it may be used."

In the case before us the question of the liability of the owner for a nuisance committed by his tenant is not involved, and we do not intend in what we have said to adopt any rule as to that matter. We have cited the authorities upon that question simply as another illustration of the underlying principle that an owner of

property is charged with certain responsibilities which he cannot shirk by turning his property over to another. If it were otherwise, James and wife could continue to reap the benefits of this den of vice by discharging Bradley and Moore and placing others of like character in their places, and when they are detected displacing them with others, and so on *an infinitum.*

In the instant case the property is not padlocked, nor taken from James and wife, and they are permitted to continue the operation of their hotel and restaurant. They are, however, enjoined to see to it that their hotel is not again diverted from lawful use and converted into a nuisance.

There being no error in the decrees of the other courts, it follows that the writ will be denied.