ALSTON *v.* STATE.

4-9077                                        226 S. W. 2d 988

Opinion delivered February 13, 1950.

Rehearing denied March 13, 1950.

*G. C. Carter* and *Mark E. Woolsey,* for appellant.

*Ike Murry,* Attorney General and *Robert Downie,* Assistant Attorney General, for appellee.

DUNAWAY, J. Appellant Alston was permanently enjoined from operating his cafe where beer was sold and from further operation of his adjoining dance hall located in the town of Altus, Arkansas. From the findings of the Franklin Circuit Court that appellant's operations constituted a public nuisance and the judgment abating this nuisance, comes this appeal.

On February 21, 1949, the Prosecuting Attorney of the Fifteenth Judicial District, proceeding under Ark. Stats. (1947), §§ 34-101 *et seq.*, filed a "Petition for Closing Order" alleging that appellant's establishment, known as "Jim Jack's Place" was operated as a public nuisance because of various violations of the law occurring there. The court entered a temporary closing order upon the filing of the petition. An amended petition was filed alleging additional grounds for closing appellant's business. All allegations were denied by the proprietor, and at the trial of the cause on March 3, 1949, the alleged and controverted law violations suffered on the premises were these: (1) Drunk and intoxicated persons are allowed to congregate about the premises; (2) beer and other intoxicating beverages are sold to minors; (3) fights, affrays and other public disturbances occur late at night; (4) persons and vehicles congregate about the place in such a manner as to constitute a traffic hazard; (5) loud and boisterous noises disturb the neighborhood; (6) beer is sold in a place where dancing is permitted on the same premises, in violation of § 40, Revised State Beer, Wine and Liquor Regulations, (1946) promulgated by the Commissioner of Revenues, said Regulations having the force and effect of law.

The court found that many intoxicated persons had been about the premises and a number arrested for drunkenness; that on two occasions beer was served to minors; that there had been some fights; that empty liquor bottles had been found scattered about the premises; that crowds of from 150 to 400 or 500 came to appellant's place of business; that no special permit authorizing dancing where beer was served had been obtained in accordance with the

Revenue Commissioner's Regulations. The judgment of the court concluded with this language:

"All of defendant's operations were in violation of the laws of our State and against the well being of the citizenship of Altus and the surrounding communities, and constituted a public nuisance.

"It is therefore the order and judgment of the court that the defendant and all other persons are enjoined permanently from the further operation of the sale of beer or other intoxicants and dancing in the property here involved."

This cause was tried in the Circuit Court. The statute (Ark. Stats. 1947, § 34-102) confers jurisdiction to abate public nuisances on both Chancery and Circuit Courts and provides (Ark. Stats. 1947, § 34-105) that the proceedings "shall be conducted in accordance with the procedure of the courts of chancery where not otherwise expressly provided herein." That the scope of our review in cases of this kind is the same as in chancery appeals was stated in *Click* v. *State,* 206 Ark. 648, 176 S. W. 2d 920. The question before us then is whether the preponderance of the testimony supports the findings of the lower court that appellant's business constituted a public nuisance.

The pertinent language of the statute under which this action was brought is as follows: (Ark. Stats. 1947, § 34-101) "The conducting, maintaining, carrying on, or engaging in the sale of alcoholic liquors, including wines and beer of all kinds, in violation of any of the laws of this State, in any building, structure, or place within this State, and the conducting, maintaining, carrying on, or engaging in the operation of any so-called roadhouse or other similar place of entertainment, or of any so-called tourist camp, or of any public dance hall or place, in violation of any of the laws of this State, * * * are hereby declared to be public nuisances, and may be abated under the provisions of this act (§§ 34-101—34-110). Any person, persons, firm or corporation conducting, maintaining, carrying on, or engaging in any of the businesses or occupations

or undertakings aforesaid, who shall suffer or permit violations of any of the laws of this State in, upon or about the premises operated by him, them, or it, shall be deemed and held to be conducting, maintaining, carrying on, and engaging in the said business, or occupation, or undertaking in violation of the laws of this State."

It will be noted that this statute declares to be a public nuisance a place where the proprietor and his agents engage in certain affirmative acts violative of the law. Such a place of business may also be a nuisance, even in the absence of affirmative unlawful acts on the part of the proprietor or his agents and employees, if he "shall suffer or permit violations of any of the laws of this State" on or about the premises. This court has frequently affirmed judgments abating as public nuisances enterprises such as the one in the case at bar, where there was no direct proof of willful law violations by the proprietor; but in these cases there has always been an allegation and proof of "frequent" violations, or of violations taking place "repeatedly" and as a "common occurrence" on the offending premises. See *Portman* v. *State ex rel. Wood*, 204 Ark. 349, 162 S. W. 2d 67; *Click* v. *State, supra*; *Digiacomo* v. *State*, 194 Ark. 24, 105 S. W. 2d 78. Unless a proprietor or those acting for him are shown to have committed some of the acts proscribed, or are shown to have acquiesced in allowing violations of the law by others, more than an isolated or occasional violation by some outsider is required before a person's place of business can be abated as a nuisance on the theory that he "suffered or permitted" such violations.

The nature of the showing which must be made to establish a place as a public nuisance under statutes similar to our own has been discussed by the courts of other jurisdictions. In *State* v. *Bernweiser*, 39 Wyo. 314, 271 Pac. 13, the Supreme Court of Wyoming said at page 15:

"The fact that liquor has been sold once, or even oftener, in a building, does not necessarily establish the character of the building as a common nuisance. The test of a nuisance is not the number of sales, or the length of

time liquor is kept, but whether the place is maintained for keeping and selling in the sense of the statute. In the equitable proceeding for injunction, the court is dealing with a place of a forbidden character and not with a forbidden act of sale. *United States* v. *Ward* (C.C.A.), 6 F. 2d 182. For the punishment of a mere forbidden act of sale, the statutes providing for criminal prosecution furnish an adequate remedy. *Barker* v. *United States* (C.C.A.), 289 F. 249; *Muncy* v. *United States* (C.C.A.), 289 F. 780. Before a court of equity should declare a place a common nuisance under the statute, it should be convinced that the place has been used for the forbidden purpose habitually, continuously, or recurrently.

"* * *, it is not necessary, in order to show a nuisance, that there shall be direct evidence of a series of sales throughout any particular period. Sales on a single day, or even a single sale, may be made in such circumstances as to justify the inference that use of the building in making the sale or sales proved was a part of a habit or practice."

The same standard of proof was stated by the Supreme Court of Tennessee in *State* v. *James,* 177 Tenn. 21, 145 S. W. 2d 783 at page 785: "The logical test which ought to be applied in every case, is not the number of sales which the evidence establishes was made but whether the evidence taken as a whole indicates recurrent acts which amount to a nuisance, * * *."

The cafe in question is in a room about 30 by 40 feet and the dance hall occupies a space of about 40 by 80 feet in the same building. There is no door inside the building from one room to the other, and the outside entrances to the two rooms are about 20 feet apart.

The testimony introduced by the state to establish the existence of the nuisance alleged is as follows: Four boys, whose ages were 15, 18, 19 and 20 years, testified that on January 24, 1949, they went together into appellant's cafe and sat in a booth. The two younger boys drank coca-colas, while the two older boys each had one bottle of beer. These boys testified that some man whom

they had met in their home town of Clarksville, but whose name was unknown to them, had bought the beer and given it to them. Their positive testimony was that this man was not a clerk of appellant, and that he left the place after giving the beer to them. The 19 year old boy further testified that he had beer given to him on one or possibly two previous occasions; that on one of these occasions someone, not an employee of appellant, had brought a beer outside to him where he was sitting in a car. This is the only testimony that beer or any alcoholic beverage was ever consumed on the premises by minors. There was no evidence whatever that any sales of beer had ever been made to minors, and no proof that on the occasions above described appellant or his employees knew that any beer had been given to minors. In fact one of the State's witnesses testified that he had once tried to buy beer but was refused because he was a minor.

Sheriff Bill Russell testified that when appellant first started business there was some difficulty because of cars parking too close to the shoulder of the highway. This situation was corrected by the establishment of a parking area across the highway and the hiring of a man to park the cars. Clearance along the highway had been good since the problem was called to appellant's attention. The Sheriff further testified that he had made "occasional" arrests at the place. The only fight he recalled was one which occurred after appellant had closed for the night and this took place in a filling station about 100 feet down the road from appellant's building. As to finding empty whiskey bottles about the premises, the Sheriff testified he found eight bottles, some of which were in the parking area across the highway, and this was the day after the place had been closed by the temporary order. The Sheriff also testified that the most arrests for drunkenness he had made here on a Saturday night was three, and on some Saturday nights no arrests at all were made. His testimony further was that during his two years as Sheriff none of the neighbors had complained of noises or disturbances at appellant's place, and that he had never received

any complaints from citizens of Altus that this was a disorderly place of business.

James Shelton, marshal of Altus and deputy sheriff, gave this testimony: He spent part of every night at "Jim Jack's Place," where on Saturday nights there were sometimes as many as 400 people. During the past year he had made some arrests here, usually on Saturday nights and mostly for drunkenness. He recalled one fight starting inside the place, but this was stopped after "one lick" was struck. The only other fight he recalled was one on the outside. Appellant did not sell beer to minors and the witness never saw any minors drinking beer, though he had seen a number of young people in the cafe where sandwiches and soft drinks were sold. His testimony for the State concluded with the statement that the dance hall "is not a disorderly place."

Jim Hyde, another witness for the State, testified that he was a deputy sheriff who worked at "Jim Jack's Place" on Friday and Saturday nights for eight or ten weeks. He described "one or two little rows", which were stopped just as they began. This witness further said that on some Saturday nights as many as four or five persons were arrested for drunkenness, while on other Saturday nights there were none. He stated that sometimes at this place, as at other beer taverns, people who had been drinking before arriving would become noticeably intoxicated after having a bottle or two of beer, and would have to be removed. On cross-examination, this witness admitted that only two people had been taken out of the cafe in a drunken condition to his knowledge, and that one middle-aged woman had been removed from the dance hall. He stated that he had never received any complaints that this was a disorderly place.

Lee Cannady, who lived in Altus 600 feet from appellant's place, testifying for the State, said that he was disturbed at night by the cars passing his house on the highway. "Q. You haven't noticed any fighting or any other disturbances? A. No sir." . . . "Q. You are not objecting to his place of business? A. No, sir."

This was all the proof made to show that appellant was maintaining a public unisance.

A large number of witnesses testified on behalf of appellant, some as to conditions existing according to their own observations and others as to the general reputation of the place as being orderly. Only a brief general statement of their testimony will be given. The mayor, recorder and two aldermen of Altus; the tax assessor of Franklin County and his deputy, a deputy sheriff, two school teachers, several business men and numerous others testified that the general reputation of the place as being orderly was good. The deputy sheriff testified that from his own personal knowledge he knew that many persons who had been arrested around "Jim Jack's Place" for drunkenness had arrived there intoxicated and were arrested before they ever entered the cafe or dance hall. The revenue inspector for Franklin County testified that he had recommended the issuance of appellant's beer license, and had inspected the place from time to time. As to the sale of beer on the same premises where dancing was permitted, he testified that the practice under this regulation was not to require a special permit where there is no entrance connecting the room in which beer is sold with the dance hall.

We have concluded that the findings of the trial court are against the preponderance of the testimony. Giving the State's testimony its strongest probative value, the proof is that drunks were arrested from time to time. There is no proof that they became intoxicated in appellant's place of business or that they were permitted to congregate there. Indeed, the testimony of the deputy sheriffs is that appellant arranged to have them on hand the nights large crowds were present for the very purpose of removing intoxicated persons and preventing them from congregating about his place.

The State relies on the case of *Digiacomo* v. *State, supra,* in arguing that sale of beer to minors has been sufficiently established in the instant case. The facts in that case were far different: There two young girls, 13 and 17 years of age, testified that on several occasions

they had been in Digiacomo's combination meat market and cafe where they had been served beer. The defense was made that the girls' escorts bought the beer and that the proprietor had given orders that no beer was to be sold to minors. The proof was undisputed, however, that the minors drank the beer at a table "close to the counter" while employees of the place "were standing right there" and that a waitress had served them the beer. It was held that in these circumstances the employer was responsible for the sales made by his employees. The distinction between that situation and the one here shown is obvious. There is no proof that anyone connected with appellant's business either knew or could have known of the isolated instances where a minor consumed one bottle of beer.

Disregarding completely the testimony as to the good reputation of appellant's place of business, the undisputed evidence shows no violations of the law by appellant or his agents, and recurrent permitted violations by others upon his premises are not shown by a preponderance of the testimony.

The judgment is reversed and the cause dismissed.

The Chief Justice and Mr. Justice HOLT dissent; Mr. Justice McFADDIN dissents in part.

GRIFFIN SMITH, Chief Justice, Dissenting. If this were a criminal proceeding of a kind requiring proof of intent and evidence of guilt beyond a reasonable doubt it *might* be possible to agree with the Court's majority. But since we have not the pardoning power, and are permitted merely to construe and declare the law, I must respectfully dissent from a determination that in effect creates, by judicial fiat, a middle ground in the nature of a refuge between conduct denounced by the General Assembly and freedom from statutory interdictions.

Act 109 of 1915, a part of which appears as Ark. Stats., § 34-105, presupposes that it is possible to engage in the sale of intoxicating drinks without violating the law; but (§ 1) engaging in illegal sales is declared to be a public nuisance, "and may be abated under the provisions of this Act."

That there were violations of the law is all but admitted.

What were the facts?

While amplification of the testimony by more extensively abstracting it would shed a great deal of light upon customs and practices, it is not necessary to go beyond the majority opinion to find the answer. Four boys, whose ages were 15, 18, 19 and 20 years, respectively, were in the grog shop. The two younger testified that they drank coca-cola, while the others had beer, "bought for them by some man from their home town whom they did not know"; and, says the opinion, "their positive testimony was that this man was not a clerk of appellant, and that he left the place after giving the beer to them". The 19-year-oldster testified that on previous occasions he had received gift-beer—"some one" having brought it to him where he was waiting on the outside in a car. The opinion says:

"There was no evidence whatever that any sales of beer had ever been made to minors, and no proof that on the occasion above described appellant or his employes knew that any beer had been given to the minors."

The effect of this statement is to say that the trial Court must gullibly accept as true the obviously evasive answers of these boys, who were attempting to protect appellant. The trial Court, and we, are not to exercise that degree of discretion ordinarily applied to situations like this, where credibility itself becomes a matter of evidence, and where doubtful conclusions are resolved in favor of the judge who heard the witnesses, appraised their attitudes while testifying, and gave credence or denied it as the clarity suggested.

But there was other evidence. A Town Marshal and Deputy Sheriff, after testifying that he "loafed around all of those drinking places", was asked if he had made any arrests at appellant's place during the past year, and replied that he had. Question: "Tell the Court what arrests were made for." Answer: "Mostly for drunkenness." Question: "How many arrests did you

ordinarily make on Saturday night?'' Answer: ''Three or four.''

It further developed that the Marshal who testified was on appellant's payroll for $30 per month, *and that half of all arrests made in the Town of Altus occurred at or around Alston's place.*

Highlights in the Town Marshal's testimony, *as abstracted by appellant,* include these statements:

''. . . On Saturday night and other nights there are dances at Alston's place. . . . Some Saturday nights there would be from 150 to 400 people there. . . . I have made arrests for a fight now and then—a little disturbance, but not much. . . . On the inside a fellow hit a fellow, but we got him out before the fight started. . . . I have seen drinking on the outside in automobiles, but I try to stop it. . . . I have seen whiskey bottles lying around on the outside, [and] I have seen them all over the town. I have seen young people under twenty-one years of age at the dance hall [adjoining Alston's place and operated by him] and [at] the beer place. . . . Except for one disturbance on the outside and the one fight on the outside I did not observe anything else except a few arguments. I have seen about fifteen or sixteen young people, under twenty-one years of age, sit in the beer place until the dance starts. We have a curfew law and people under eighteen are not supposed to hang around after ten o'clock. . . . Didn't think Alston sold beer to persons under twenty-one. . . . The dance hall is not a disorderly place''.

Jim Hyde, a Deputy Sheriff, testified: ''I made a good many arrests for drunkenness. . . . I have seen boys under the age of twenty-one in the beer and cafe parts. . . . The young people range from fifteen or sixteen years up. . . . They usually gather about 7:30 or 8:00 o'clock in the beer joint or cafe; the dance didn't start until eight. Some of these young people would go into the dance and some wouldn't. I helped arrest two boys under nineteen for drunkenness. Neither of these was in the dance that I know of. I have never arrested

a girl there under age, but I took one drunk woman, ['Blondie', we called her] out of the dance hall. She was 35 or 40, or maybe older than that. 'Blondie' was supposed to be from California". The witness did not know her.

Continuing his testimony, the witness Hyde said: "As to the arrests made for drunkenness about this place, *it happens very often* that fellows go get whiskey and then come in a beer joint. When he comes in you think he is sober, and when he drinks a bottle or two of beer he gets drunk as a lord. . . . Some of those arrested at Alston's place for drunkenness got drunk in some other place in town and then came down there. I have seen them come to this place and they would be pretty drunk when they got there".

Questions by the Court: "A moment ago, in describing the manner in which these persons became drunk, you stated that 'it happened that some came in there when they had been drinking whiskey, then they would buy a bottle or two of beer and sit there fifteen or twenty minutes, and they would be drunk', is that correct? Answer: "Yes, sir." The Court: "Then you said you noticed some men come in and sit on stools and drink beer and become drunk?" Answer: "Yes, sir." The Court: "Have you observed that in [Alston's] place?" Answer: *"That happens in all of these beer places".* The Court: "You are saying that this happened in Mr. Alston's place, and has also happened in other places?" Answer: "Yes, sir! We drag them away from the counter where we see them drinking and take them to jail". [The witness later stated that "Mr. Shelton took two out"] . . . "We picked up two or three boys who said they were nineteen years old. I have never seen the eighteen-year-old girls there."

Excerpts from testimony abstracted by the Attorney General serve to emphasize the conduct complained of by the State:

Sheriff Bill Russell: "Alston runs a cafe and beer parlor and has a skating rink and dance hall. . . .

Alston asked me to deputize Ellis Lauhon, and he stays there all the time. Lauhon is Recorder of the Town of Altus, elected by the people". As a Deputy Sheriff, (paid by Alston on the basis of $5 for each night he worked "directing parking") Lauhon thought "that when a car drove up and some one got out and we found it necessary to arrest them before they were in Alston's place, it was plain to know that they got drunk in some other place."

From the abstracted testimony of Jim Hyde: (Question on cross-examination relating to drunks on stools): "They could have gotten drunk at some other place in town and they come in down there?" Answer: "That is right; some of them fell when they came in". Question: "You have never observed them selling beer to minors?" Answer: "Only what these boys said". Question: "Did you say there was a night when it seemed that everybody was drunk?" Answer: "No, sir! I said drunks run something like traffic on the highway—you can see lots of it sometimes, and then none for awhile. . . . About five is as many as we ever took [to jail on a single night]. We did bring up six, but one got away. . . . Mr. Shelton and I walked through once in awhile, and you can tell when they are getting drunk. . . . I am not singling out Mr. Alston's place; [the illustration] applies to all of them. . . . I think Jim [Alston] wants his place run 'nice', because he never makes a kick about us getting anybody".

Against this testimony and other evidence somewhat similar, there is appellant's denial and the testimony of these who do not pretend to have personal information, that they have heard that Alston runs an orderly place and that he does not permit law violations.

There is no suggestion that the proceedings against Alston were motivated by political prejudice, personal unfairness, or because of spitefulness. The record clearly reflects that the Prosecuting Attorney's conduct was motivated by a desire to discharge his official duties in circumstances showing extreme difficulty in meeting

local unwillingness to testify against a resident. For this Mr. Partain is to be commended. The proof does not justify us in nullifying the Prosecuting Attorney's work in behalf of public morals and law enforcement by lightly brushing aside proven violations of law because there were but few and appellant's financial investments were heavy.

I think the unintentional error of the majority opinion is its assumption that a protracted course of illegal conduct must be established before it can be said that a case has been established by preponderating evidence. One can not read statements of the prosecuting witnesses without concluding that their official duties upon the one hand and their personal friendship upon the other had coalesced to an extent subsidizing intellectual frankness—something always to be suspected where the State must rely upon testimony of someone who is paid by the defendant.

And yet, in spite of this procedural difficulty, there is implicit in the examinations all that the prosecution was required to show. In addition there is positive testimony—not inferences, that near-drunks were served with beer while occupying stools at the counter, that minors drank—admittedly on occasions; that half of the arrests made in the entire town occurred on appellant's premises, where empty whiskey bottles were scattered; that young people, from age fifteen up, congregated to become patrons of the same proprietor's dance hall when it should open, where "Blondie's" conduct, both before and after arrest, was not calculated to promote admiration for grog-shop deportment or inspire juvenile respect for the kind of entertainment recommended by the State.

The sale of intoxicants, as has so often been said, is a mere license, as contrasted with a right. The State may attach any condition it chooses, and the seller must abide the consequences of his own mistakes as well as the misconduct of those with whom he surrounds himself, either as agents, employes, or invitees. His obligation is not only that he will not violate the law, but

that he will not permit it to be violated on or within the business environments of the place he operates.

Ed. F. McFADDIN, J., (dissenting). From a reading of the transcript in this case, I reach the following conclusions:

(1)—There is sufficient evidence of sales of liquor to minors to justify the injunction against the beer parlor. The evidence in this case, as to drinking by minors in the beer parlor, is similar to the evidence in *Digiacomo* v. *State,* 194 Ark. 24, 105 S. W. 2d 78; so I dissent from the majority holding as regards the beer parlor.

(2)—There is not sufficient evidence to support the injunction closing the dance hall; and on that issue I agree with the majority.