JOHNSON *v*. TENNESSEAN NEWSPAPER, INC., *et al.*
(two cases).

(*Nashville,* December Term, 1950.)

Opinion filed June 16, 1951.

288

GOODPASTURE, CARPENTER & DALE, of Nashville, for appellants.

HUME, HOWARD, DAVIS & BOULT, of Nashville, for Tennessean Newspaper, Inc.

CLAUDE CALLICOTT, of Nashville, for City of Nashville and Board of Park Com'rs.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

The City of Nashville and its Board of Park Commissioners own and maintain Centennial Park within the municipal boundaries for the well-being etc. of the public, and in conjunction with the Nashville Tennessean provided for the entertainment of the public by a musical concert upon the grounds of this park on May 29, 1949. Mrs. Annette Johnson was among the thousands who attended. While walking in this park along with many of those in attendance at a place where it was expected the public would walk she stepped into an invisible hole more particularly hereinafter described. The resulting injuries were severe and painful. She and her husband instituted separate suits for damages against the Tennessean, the City of Nashville and its Board of Park Commissioners.

At the conclusion of the trial of the two cases heard as one the Trial Judge directed a verdict in favor of the Tennessean because it had no control over this park or the manner in which its grounds should be kept. The question of whether the City and its Park Commission were guilty of a nuisance in the operation and maintenance of the park in connection with the existence of this hole into which Mrs. Johnson stepped was submitted to the jury over objection. The first count of the declarations sought a recovery against the City and its Park Commission on that ground. The jury returned verdicts for Mr. and Mrs. Johnson.

The Court of Appeals affirmed the action of the Trial Judge with reference to the directing of a verdict for the Tennessean. That defendant is no longer before the Court. But the judgment of the Circuit Court was reversed and the suit dismissed as to the City and its

Board of Park Commissioners. The Court of Appeals found with reference to this hole that "as originally created and constructed, this outlet was safe and constituted no nuisance. A dangerous situation resulted from the manner in which it was maintained. But this dangerous situation was the result of the negligent manner in which a proper, safe and correct system was maintained. The municipality is not liable for such negligence in the performance of this governmental function."

Mr. and Mrs. Johnson filed petitions for certiorari. The writs were granted, and the question is now to be decided.

About the year 1926 respondents decided to restore or repair the Parthenon located in Centennial Park and to make its beauty more readily discernible to the public. In accomplishing this, much shrubbery or growth east of the Parthenon was removed. Young trees and flower beds were planted. The particular section east of the Parthenon involved here and involved in those improvements consisted of a strip of land called the Mall. In order to furnish water to these trees and flower beds and grass four water mains were placed under this Mall and at intervals outlets were constructed, four of them upon each water main. These outlets consisted of a hole about 8 inches in diameter and 18 inches deep. This hole was encased with clay pipe. A small iron water pipe was connected to the main at each of these holes and came up through the center of the hole to a point just below the surface of the ground. The watering of the trees, flowers, etc. was accomplished by attaching a hose to these pipes. A round concrete block 2 inches thick and 9½ inches in diameter with a circular about thumb size hole in its center was placed over the top of each of these

holes for the purpose of covering. It very frequently happened through the following years that these concrete blocks were removed by children or adults. They were often found in the children's playground. This removal was easily accomplished because of the circular center hole in the block, that hole being there for that purpose. It was the duty of the employees to either replace a removed block or, if lost, to procure from the supply kept on hand another such block and place it over the hole. It was also their duty to examine the outlets for ascertainment of whether the blocks had been removed.

In connection with this duty of the employees to examine the outlets for the discovery of whether a concrete block had been removed from any of them it may as well be said at this point that the question of negligence is hardly involved because an employee might examine the outlets at a given time and find them all covered with these blocks, and then within a few minutes thereafter some child or adult was likely to remove a block from one of the outlets inspected a few minutes earlier. The existence of the uncovered invisible hole into which Mrs. Johnson stepped illustrates the quite apparent fact just stated. An employee testifies that he had occasion to observe this particular hole not more than two days before this accident and found the concrete block in place.

The entire surface of the Mall was sown in Bermuda grass. This grass grew over these holes to such an extent as to conceal the existence of the holes.

Mr. and Mrs. Johnson along with about 10,000 others were in the park for the purpose of enjoying the concert. They and many others were on this Mall where the respondents here expected the public would be. As Mrs. Johnson and her husband were walking along unaware

of the existence of such danger, she stepped into one of these invisible holes and her leg went apparently to its bottom with the resulting injuries mentioned.

It was testified by the general manager for the Park Commission, he having been previously superintendent of the park for 17 years, that these concrete blocks with a hole in the center made "an attractive play thing", and that those in charge of this park had trouble keeping them "in place on account of boys playing with them". This official admitted that these holes when the concrete tops were not on were "regular pitfalls or traps" and known to be "extremely dangerous". Much other testimony to the same effect was given on cross-examination by other officials or employees of respondents.

Inasmuch as a City acts in its governmental capacity in the operation and maintenance within its boundaries of a municipally owned park, it is not liable for injuries to a member of the public resulting from negligence of its servants or employees in the operation and maintenance of such a park, *Mayor and City Council of Nashville* v. *Burns,* 131 Tenn. 281, 174 S. W. 1111, L. R. A. 1915D, 1108, unless the municipality "authorizes or with knowledge permits" such parks "to be so negligently constructed or operated by its agents as to become a nuisance detrimental to health and property". *Mayor, etc., of Knoxville* v. *Klasing,* 111 Tenn. 134, 138, 76 S. W. 814. That was a case not involving a park, but involving a function of the municipality in which it was acting in a governmental capacity. Hence, the principle stated is in point and of general application where a city is acting in a governmental capacity.

There can be no reasonable disagreement, in our opinion, with the conclusion that the above described condition being so long maintained in this park created a

situation fraught with danger to those of the public who, in the exercise of their rights, went into this park for pleasure or recreation. It was a condition that had existed for many years with the knowledge of those through whom a municipality must act.

█ Stripped of legal refinements, and more or less "hair line" distinctions (which must be taken into consideration) the ordinary concept of an actionable nuisance is a recurring act, *State* v. *James*, 177 Tenn. 21, 26, 145 S. W. (2d) 783, "wrongfully done or permitted which injures or annoys another in the enjoyment of his legal right". *Cooper* v. *Overton*, 102 Tenn. 211, 216, 52 S. W. 183, 184, 45 L. R. A. 591.

█ The above described dangerous situation which had been maintained in this park for a long number of years seems to come within this ordinary concept of an actionable nuisance.

The brief of respondents and, as. we understand it, the oral argument of their counsel, seems to concede that the above described condition in this park which brought about the injuries of Mrs. Johnson was a "dangerous situation". It is insisted, however, that there is no evidence that these respondents "by any affirmative acts created this dangerous situation" and that "all the evidence shows that such condition was not an object of the defendants, but existed contrary to their intent, orders and instructions". It is said that because of such alleged absence of "affirmative action" upon the part of respondents in connection with the existence of this dangerous condition they, the respondents, cannot be guilty of having committed a nuisance. *Burnett* v. *Rudd*, 165 Tenn. 238, 54 S. W. (2d) 718 is principally relied upon in support of this insistence.

*Burnett* v. *Rudd* was a case involving the exercise of a governmental function by the City. Its fire engines, in responding to calls to burning buildings, were in the habit of driving through the streets of Knoxville at a very dangerous rate of speed and without regard to the requirements of traffic ordinances. One of its engines had been so driven on the occasion that resulted in the *Burnett* v. *Rudd* damage suit for injuries received by plaintiff. This Court in that case said: "Counsel fail to distinguish between a condition produced by the affirmative action of the city and the negligent acts of its employees resulting in injury to a citizen. The city created no condition upon Gay street that could be classed as a nuisance." 165 Tenn. at page 247, 54 S. W. (2d) at page 720. And, in absolving the city from liability, held that: "fire apparatus and other vehicles of a municipal fire department, whose function is the saving of life and property, are, when in use for such purpose, exempt from traffic regulations, such as those fixing speed limits and prescribing the mode of turning at intersections." 165 Tenn. at page 249, 54 S. W. (2d) at page 721.

It is apparent that *Burnett* v. *Rudd* bears no resemblance to the instant case other than that it restates the rule upon which respondents rely in their insistence that they, the respondents, were guilty of no affirmative action in bringing about the dangerous condition existing in the instant case; therefore, that these respondents cannot be guilty of a nuisance. No doubt the case is cited by respondents principally because of its re-statement of this rule.

This brings the case at bar to the question of whether there was any affirmative action upon the part of these

respondents in producing or maintaining the dangerous condition that had existed in this park for many years.

It is an undisputed fact that these sixteen holes covered by these easily removable concrete blocks were located, constructed and covered in this park in 1926 in exactly the manner in which these respondents intended that they should be located, constructed and covered. It was then discovered that the condition thus intentionally created was in fact a dangerous condition by reason of the fact that these concrete tops as constructed were of such a nature as to constantly from time to time invite removal by children, youths or adults rightfully in this park, and were in fact being so removed. The grass grew in the Mall where these holes were located just as it was intended that it should grow, and that grass, by growing over and thereby concealing the top of these holes, added to the known dangerous condition. Respondents kept a number of blocks to replace those which had been removed and taken away or rolled as a plaything into the lake. Notwithstanding the facts stated, respondents continued through all the years to maintain this dangerous condition which they had originally created.

From all above stated, it must be necessarily concluded that these respondents were guilty under the undisputed evidence of affirmative action in bringing about and in maintaining this dangerous condition amounting in fact to a nuisance, and that the Trial Judge did not commit error in submitting the case to the jury on this theory in so far as it applied to these respondents.

Exactly in point is our case of *City of Nashville* v. *Mason*, 137 Tenn. 169, 192 S. W. 915, 916, L. R. A. 1917D, 914. That was a case in which the City maintained a garbage dump (a governmental act), and in which there was always a fire kept burning, generally low, but some-

times with larger flames. On the day that the plaintiff's house was burned a high wind swept over this dump in the direction of the plaintiff's house and thereby communicated this fire to that house. The Court in holding that the City was maintaining a nuisance, and thus liable, said this: "We think that a pile of garbage, such as this, left to burn at will during a high wind, was a nuisance and a menace to the plaintiff's enjoyment of his property rights. The city was without right to do this. The result is that the Court of Civil Appeals is affirmed."

It will be noticed that the immediate cause of the fire in *City of Nashville* v. *Mason* was a high wind which the City of Nashville knew might occur at any time. Thus a condition fraught with danger was created and maintained. So in the present case, the immediate cause of the injury was the removal of this concrete slab by some child or person in this public park, thereby creating an invisible trap to members of the public, a fact which respondents knew might occur at any time. Thus a condition fraught with danger was created and maintained.

In our opinion it is impossible to sustain the contentions of Nashville and its Board of Park Commissioners without in effect overruling *City of Nashville* v. *Mason,* supra. By so overruling that case we would extend the widely and generously criticised doctrine of immunity of a governmental entity from liability for its torts. Not only the rule of *stare decisis,* but also the principles of justice forbid such extension of this harsh rule of immunity to the government from liability to faultless individuals injured by its torts.

The judgment of the Court of Appeals will be modified so as to reverse its order dismissing these suits against the City of Nashville and its Board of Park Commissioners. The judgments of the Circuit Court awarding Mr.

and Mrs. Johnson damages against the City of Nashville and the Board of Park Commissioners of the City of Nashville will be affirmed with the costs of all Courts adjudged against them.

The Chief Justice did not participate in the consideration of this case because he was unavoidably absent when the case was orally argued.

All concur.